Charles A. SMOTHERS, III, Appellant,

v.

UNITED STATES, Appellee.

No. 12896.

District of Columbia Court of Appeals.

Argued April 11, 1979.

Decided June 15, 1979.

---

R. Kenneth Mundy, Washington, D. C., appointed by the court, for appellant.

Richard W. Hausler, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Theodore A. Shmanda, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY and GALLAGHER, Associate Judges.

KELLY, Associate Judge:

Following a jury verdict of guilty on all counts charged, appellant was sentenced for felony-murder (kidnapping), felony-murder (rape), felony-murder (robbery), premeditated murder while armed, armed kidnapping, armed rape, armed robbery, grand larceny, unauthorized use of a vehicle, and carrying a pistol without a license.[1] We

reverse, for insufficient evidence, the convictions for kidnapping, for felony-murder (kidnapping), and for armed kidnapping. We vacate the convictions of lesser included offenses for which appellant was not sentenced. We affirm the convictions on all other counts.

I

The victim in this case was a forty-three-year-old woman. On Thursday, December 2, 1976, she left work around 5:15 p. m. At 6:45 p. m. she called her sister, reported that she had just finished shopping at Iverson Mall, and said to expect her for a visit in about ten minutes. She never arrived. Her relatives made phone calls and visits to her home, her office, and her friends, but they found no sign of her.

At 2:00 p. m. the next day, the victim's body was found partially concealed by the shrubbery in an isolated cul-de-sac behind St. Elizabeths Hospital in the District of Columbia. She had been shot six times in the trunk and once in the hand. Her body was lying on its back with pants and underwear pulled down below her knees and her shirt pushed up over her breasts. Scratches and abrasions appeared on her exposed thighs and buttocks. Intact sperm were found inside her vagina and a foreign pubic hair was found on her exposed brassiere.[2] Her gloves were found nearby. Her watch and the purse she usually carried were not in the area; neither was the new Dodge Charger that she had just bought.

Around midday on Thursday, the appellant had shown several friends his uncle's pistol and seven bullets. He had asked at least one of them whether he wanted to accompany him to Iverson Mall to pick up some "easy money" by robbing one of the "bunch of women out there." His friend declined the offer. Ballistics tests later positively identified two bullets found in the victim's body and one found beneath the corpse as fired from the uncle's pistol.

---

1. D.C.Code 1973, §§ 22–2401, –2101; 22–2401, 2801; 22–2401, –2901; 22–2401, –3202; 22–2101, –3202; 22–2801, –3202; 22–2901, –3203; 22 2201; 22-2204; 22–3204.

2. No positive identification of hair is possible, but this hair matched all the characteristics of appellant's pubic hair.

A fourth, damaged, bullet was identified as "highly probable" for that gun. Appellant's uncle testified that appellant knew where the gun was kept, but had no permission to use it. Appellant was not licensed to carry a pistol in the District of Columbia.

On Friday evening, a few hours after the victim's body was found, appellant gave the victim's gold watch to his girlfriend's mother as a present. He also picked up several of his friends in the victim's new Dodge Charger and drove around the neighborhood with them.

The next morning, Saturday, appellant gave the car keys to a friend and asked him to move the car, saying that he didn't want his mother to see him with it. As the friend started the car, he was arrested by plainclothes police who had spotted and staked out the car in a parking lot behind appellant's residence. When appellant saw the arrest, he told two other friends that the car was stolen and said:

> [T]o top it off I shot a lady . . . I think I killed her, man. * * *
>
> I don't know, I just went off, you know, just like that. * * *
>
> . . . I killed the bitch; don't ask me why, I just flipped out.

Appellant's case at trial was limited to the presentation of an insanity defense.[3] Since the burden of proving insanity lies on the defendant, D.C.Code 1973, § 24–301(j), appellant's evidence was presented first in this segment of the trial.

Appellant's paternal grandmother testified that his mother had been an unmarried, sixteen-year-old alcoholic who had left him to his grandmother's care when he was eight-months-old. When appellant was eight-years-old, his father had taken custody of him and, for the next six years, treated him with physical and emotional cruelty and abuse. Appellant finally left his father and found refuge with his aunt and uncle. The grandmother told the jury that appellant had often had violent nightmares while living with her as a small child.

Appellant's aunt confirmed the grandmother's testimony. She also testified that appellant had had frequent serious nightmares while living with her from the age of fourteen until the date of the offense. She then described him as a gentle and talented boy, scarred by his father's harsh treatment. Finally, she blamed appellant's father for this tragedy. At that point, the trial judge stopped her testimony and, over objection, ordered her last comments stricken from the record.

Appellant's girlfriend testified to his generally gentle character. She then described two incidents a few weeks prior to this murder. Appellant had been in a cheerful and pleasant mood when he suddenly went into a fit of terrified crying. She had also seen him playing with stuffed animals and treating them as real people and calling them by name.

The final witness for appellant was Dr. John Schultz, a psychiatrist. The trial judge prefaced this expert testimony with a witness instruction, delivered in the presence of the jury. The instruction, drawn from *Washington v. United States,* 129 U.S. App.D.C. 29, 42, 390 F.2d 444, 457 (1967), warned the witness and the jury that psychiatric evaluations of mental condition should not speak to the ultimate issues of guilt or innocence and that personal opinions should not be mixed with judgments based on medical expertise.

Dr. Schultz testified that appellant suffered from a borderline psychosis of a schizophrenic character. He believed that appellant could exercise emotional control only in regard to a select group of family and friends. Thus, he could not conform himself to expectations of reasonable behavior and was not responsible for his actions toward strangers.

The government called two psychiatrists and a psychologist to testify on the insanity issue. All testified that appellant had none of the essential traits of schizophrenia.

---

**3.** At the close of the government's evidence, appellant moved for a judgment of acquittal on the rape and kidnapping charges and the relat-ed felony-murder counts. The court denied these motions.

Psychological testing indicated that he was above average in intelligence and without organic brain damage. There were some signs of immaturity and of a potential for emotional outbursts, but they saw no evidence that appellant could not make moral judgments or could not control himself. The jury convicted appellant on all counts and rejected a finding of not guilty by reason of insanity.[4]

## II

Appellant challenges the constitutionality of D.C.Code 1973, § 24–301(j), placing the burden of proof in an insanity defense on the defendant. He also asserts numerous errors by the trial court in the handling of evidence and of the witnesses. Finally, appellant challenges the sufficiency of the evidence to support the convictions for rape and kidnapping.

### A. *The Constitutional Challenge*

Congress, in 1970, added a final sentence to subsection (j) of the criminal code chapter dealing with insane criminals. D.C. Code 1973, § 24–301(j) now concludes:

No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence.

This court considered at length the constitutionality of § 301(j) in *Bethea v. United States,* D.C.App., 365 A.2d 64 (1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). We noted that the jury considers an insanity defense only after it has been satisfied beyond reasonable doubt of the defendant's culpability for the underlying offense, including the necessary mens rea. Thus there is no conflict with the principle of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that the prosecution must prove, beyond reasonable doubt, each element of every offense. *Bethea v. United States, supra* at 93–95.

Whatever doubt remains on this question has been settled by *Rivera v. Delaware,* 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976). There the Supreme Court dismissed "for want of substantial federal question" a constitutional challenge to a Delaware Supreme Court decision, *Rivera v. State,* 351 A.2d 561 (Del.Super.1976), sustaining a statute virtually identical to D.C. Code 1973, § 24–301(j). Dismissals for want of federal question are decisions on the merits, binding on lower courts, "until such time as the Court informs [them] that [they] are not." *Hicks v. Miranda,* 422 U.S. 332, 344–45, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975). Thus appellant's constitutional challenge cannot succeed.

### B. *The Evidence and the Witnesses*

Appellant argues that the trial court erred in admitting eyeglasses into evidence, in admitting the hearsay telephone statements of the victim to her sister, in cutting short the testimony by appellant's aunt, and throughout its treatment of the defense psychiatrist, Dr. Schultz.

The eyeglasses were identified by the victim's optician as resembling in every way those which were made for her. Her sisters said that they looked like those the victim used for driving. Police officers testified to the retrieval of the glasses from the hood of a wrecked car near where the victim's car was recovered. This was certainly enough to place their admissibility within the discretion of the trial judge. *Ford v. United States,* D.C.App., 396 A.2d 191, 196 (1978). Any arguments about the likelihood of someone else's glasses resembling those of the decedent could have been, and actually were, properly made to the jury. Appellant's current claim that the glasses entered into evidence were undamaged and could not be the damaged glasses originally retrieved by the police is without

---

4. The trial judge did not sentence appellant for the lesser included offenses of which he was found guilty. He did not, however, vacate those convictions. This court has repeatedly noted that it is the duty of the trial judge and counsel to correct these errors before appellate review. *Ellis v. United States,* D.C.App., 395 A.2d 404, 413 (1978). The lesser included convictions for unarmed premeditated murder, rape, and robbery must be vacated.

merit. Appellant's counsel himself noted at trial that one lens was missing from the glasses offered into evidence.

█ The hearsay testimony about the decedent's intent to promptly visit her sister could have influenced the jury only in regard to the kidnapping charges. We hold, below, that even with the telephone call considered, there was insufficient evidence to support those convictions. Thus we need not now consider the intricacies of the future intent expression exception to the hearsay rule. The hearsay statement placing the victim at Iverson Mall, if error at all, was harmless and merely cumulative, for sales receipts independently placed her in that area and the testimony of her supervisor showed that early evening was the first time she could have been there. Thus we need not now consider the present sense impression exception to the hearsay rule.

The trial judge cut short testimony by appellant's aunt and ordered the jury to ignore all of the comments except those based on her personal observation of appellant's nightmares. It did so after the witness had begun to blame appellant's father for his problems and at a point when several jurors were in tears.

Appellant now contends that her testimony on appellant's background and upbringing was essential to an assessment of his sanity at the time of the offense and that it was improperly and prejudicially cut short. It is true that diverse aspects of defendant's life including "his upbringing in slum or suburb" may be relevant to an assessment of his mental health, *Washington v. United States, supra,* 129 U.S.App.D.C. at 38, 390 F.2d at 453, and that "[l]ay witnesses may testify upon observed symptoms of mental disease . . . ." *Carter v. United States,* 102 U.S.App.D.C. 227, 237, 252 F.2d 608, 618 (1957). However, "[s]uch witnesses may testify *only* upon the basis of facts known to them. They may testify as to their own observations and may then express an opinion based upon those observations." *Ibid.* (Emphasis added). And the trial judge has a duty to carefully control such testimony in order to avoid mere appeals to the sympathy of the jury and the dangers of "variable or sliding scales of criminal responsibility." *Bethea v. United States, supra* at 88.

█ In this case the trial judge stopped the witness' testimony only when she had gone well beyond a description of the things of which she was personally aware and when it appeared that the testimony was essentially an emotional appeal. The judge properly allowed the jury to consider her testimony about the nightmares of which she knew from first-hand experience. Testimony from appellant's grandmother and his girlfriend adequately covered the other significant details of his background. No abuse of the trial judge's discretion appears here.

Appellant asserts two forms of error in regard to the trial judge's handling of Dr. Schultz. The first is the claim that the giving of the *Washington* instruction to the sole defense expert witness and to none of the three government experts prejudiced appellant's case in the eyes of the jury. The second claim is that the trial judge unduly interrogated and denigrated Dr. Schultz because of the trial judge's own disbelief in the doctor's testimony.

In *Washington, supra,* the Court of Appeals for the District of Columbia Circuit dealt extensively with the appropriate procedures for expert testimony in cases where insanity was asserted as a defense to criminal liability. Since the *Washington* decision was rendered before the effective date of the Court Reorganization Act, it is binding on this court, absent reconsideration en banc, under the principles of *M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

The circuit court was particularly concerned that medical testimony could either be incomprehensible to the jurors or might seem so conclusory about mental capacity as to infringe upon the jury's right and duty to assess liability. Accordingly, the court drew up a specific instruction cautioning the witness to speak in clear and nonconclusory terms, to limit opinion testimony to that based on medical expertise, and to

be prepared to respond on adversarial cross-examination. A copy of this instruction was to be sent to all expert witnesses as an aid to their medical examinations of a defendant before trial. The court also ruled that

> To ensure that counsel and the jury are also so advised, the trial judge should give the explanatory instruction in open court to the first psychiatric witness immediately after he is qualified as an expert. It need not be repeated to later witnesses. Some of it will be repeated in the court's instruction to the jury at the end of the trial, but we think the jury should hear it in full and *before* the testimony. . . . [*Washington v. United States, supra,* 129 U.S.App.D.C. at 42, 390 F.2d at 457 (emphasis in original).]

██ The trial judge, acting in accordance with that holding, committed no reversible error. Nevertheless, to ensure equal treatment before the jury of psychiatric witnesses called by both the prosecution and the defense we recommend that in future cases the trial judge make clear that the *Washington* instruction applies equally to all such witnesses. One way to do so may be by exercising discretion to choose to repeat the instruction to later witnesses. We expect that that procedure will dispel any apparent unfairness to the party whose expert is first called.

██ Appellant's assertion of undue judicial interference with the witness is without merit. This court will order new trials when the trial court enters into examinations in ways that substantially prejudice defendants, *e. g., Petway v. United States,* D.C.App., 391 A.2d 798 (1978), but this is not such a case. The trial judge's open statements to Dr. Schultz were constructive and instructive. To the extent that they were less favorable than the comments to government witnesses they were justified by the rambling nature of Dr. Schultz's testimony. The judge's more severe instructions to the doctor were properly given at the bench, out of the hearing of the jury, and Dr. Schultz's subsequent testimony indicates that he was in no way cowed, or even much impressed, by the judge's comments.

## C. Sufficiency of the Evidence

██ At the end of the government's case on culpability, defense counsel moved for a judgment of acquittal on the rape and kidnapping counts. Appellant now appeals the denial of those motions, challenging the sufficiency of the evidence to support convictions on those charges. The appropriate standard is whether, viewing the evidence in the light most favorable to the government, we can say that no reasonable juror could have been convinced beyond reasonable doubt that appellant was guilty of these crimes. *Calhoun v. United States,* D.C. App., 369 A.2d 605 (1977). While a jury verdict will be affirmed if the evidence can be read to support it, that evidence must be a basis for inference, rather than for mere speculation, as to each and every element of an offense.

██ The conviction for rape is amply supported by the evidence here. The two elements of the offense of rape are sexual penetration of the victim and that that penetration was against her will. D.C.Code 1973, § 22–2801. Medical testimony about sperm in the victim's vagina supports the inference of penetration and the circumstances provided a more than adequate basis for belief that appellant was responsible.

The evidence includes a photograph which clearly shows that the victim's clothing had been forced down and up to expose her genitals while she lay on her back. From the position of the clothing on her body it is clear that she had no chance to change her position between the time her clothes were disturbed and the time that she was shot. The finding of two spent bullets in the ground beneath her body supports that conclusion, as do the paths of the bullets that went through her body. Ample evidence connected appellant to the gun from which those bullets were fired. It was not mere speculation for the jury to infer that appellant had used coercion to force the decedent into sexual intercourse.

The conviction of kidnapping is more troublesome. The elements of the offense of kidnapping include, among other things, a requirement of "carrying away" or "holding or detaining" of the victim. D.C.Code 1973, § 22–2101. Seizure and detention of the victim against her will is "the heart of the crime." *United States v. Wolford,* 144 U.S.App.D.C. 1, 8, 444 F.2d 876, 883 (1971).

We have assumed, without deciding, that the victim's phone call to her sister was admissible in this case. The evidence then showed that the decedent was near Iverson Mall and, at one point, said she intended to go to her sister's home. It also showed that appellant had said that he intended to take his uncle's pistol to Iverson Mall to rob some of the women there. Finally, we have appellant's admission that he shot a woman, we have the discovery of her body (with his bullets in it) near St. Elizabeths Hospital, and we have his use of her watch and car.

 This evidence is insufficient to support an inference that the victim was taken from one place to another against her will. There is, of course, absolutely no evidence that even remotely suggests that the decedent willingly went to St. Elizabeths Hospital with the appellant. But the point is that, as the trial judge correctly instructed the jury:

> [T]he law does not require a defendant to produce evidence or prove his innocence, so that, unless the government proves by evidence beyond a reasonable doubt that the defendant committed each and every element of an offense of which he's charged, with respect to such a matter, you must find the defendant not guilty.

 In this case there were no signs of a struggle in the car and medical testimony established that the victim suffered all of her injuries immediately before death.[5] In denying appellant's motion for a judgment of acquittal on the kidnapping charges, the trial judge relied on *State v. McKenzie,* 557 P.2d 1023 (Mont.1976), *vacated and remanded on other grounds,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), *aff'd on remand,* 581 P.2d 1205 (Mont.1978), and *Wooten v. United States,* D.C.App., 343 A.2d 281 (1975), for the rule that a kidnapping conviction could be based on circumstantial evidence. This rule is correct; there is no legal distinction between direct and circumstantial evidence. *Calhoun v. United States, supra* at 607. In this case, however, neither direct nor circumstantial evidence showed a taking against will. *See Morgan v. United States,* D.C.App., 402 A.2d 598 (1979).

The kidnapping conviction and the armed kidnapping and felony-murder (kidnapping) convictions based upon it are reversed. The convictions of lesser included offenses listed in note 4, *supra,* are vacated. The convictions on all other counts are affirmed.[6]

*So ordered.*

---

5. The detention, coercion, or confinement which is an integral part of every rape c .nnot support a separate conviction for kidnapping. *Compare Robinson v. United States,* D.C.App., 388 A.2d 1210 (1978), *with Sinclair v. United States,* D.C.App., 388 A.2d 1201 (1978).

6. The contention that the robbery convictions must fail for want of proof that the watch, purse, and automobile of the decedent were taken *before* the victim died was raised, for the first time, at oral argument. It is settled law in this jurisdiction that a dead person can be a robbery victim, at least where the taking and the death occur in close proximity. *United States v. Bolden,* 169 U.S.App.D.C. 60, 66, 514 F.2d 1301, 1307 (1975); *United States v. Butler,* 147 U.S.App.D.C. 270, 271 n.1, 455 F.2d 1338, 1339 n.1 (1971); *Frady v. United States,* 121 U.S.App.D.C. 78, 100, 348 F.2d 84, 106 (en banc), *cert. denied,* 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965); *Carey v. United States,* 111 U.S.App.D.C. 300, 296 F.2d 422 (1961).