**James M. HEAD, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 80-951.**

District of Columbia Court of Appeals.

Argued March 17, 1982.

Decided Sept. 14, 1982.

---

Samuel M. Shapiro, Rockville, Md., appointed by the court, for appellant.

Kathleen E. Voelker, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., at the time the brief was filed, John A. Terry, Asst. U.S. Atty., at the time the brief was filed, and Steven D. Gordon, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before KELLY, KERN and PRYOR, Associate Judges.

PRYOR, Associate Judge:

After a jury trial appellant was convicted of two counts of felony murder while armed,[1] two counts of premeditated murder while armed,[2] four counts of armed kidnaping,[3] and two counts of armed robbery.[4] Appellant argues (1) that the delay between arrest and trial denied him his right to a

---

1. D.C.Code 1973, §§ 22–2401, –3202.

2. *Id.*

3. *Id.,* §§ 22–2101, –3202.

4. *Id.,* §§ 22–2901, –3202.

speedy trial; (2) that there was insufficient evidence to support his convictions; (3) that the trial court incorrectly instructed the jury as to aiding and abetting; and (4) that the trial court erred in admitting evidence of other crimes. We agree there was insufficient evidence to support the armed kidnaping convictions and accordingly we reverse them. Finding appellant's other arguments unpersuasive, we affirm the convictions on all other counts.

I

This case arose from the shooting deaths, on the evening of December 4–5, 1977, of Edward Williams and Angelo Rowe, employees of a service station in Northeast Washington owned by George Morton, Jr. On the afternoon of December 4, 1977, appellant James Head visited the service station when both men were on duty. Shortly afterwards Morton appeared at the station and observed appellant talking to Rowe. Appellant approached Morton to discuss the repayment of an outstanding loan of money. Shortly afterwards, Morton left the premises. He returned around 9:50 p.m. to cash a money order for a friend. However, Rowe and Williams, who were the only employees on duty that night, were absent and the station was locked but not closed for the evening. The tow truck was outside of the bay of the station and the pump lights were on. Rowe's car was visible but Williams' car, a green Mercury with a white top, was absent. Surmising that his employees had gone out to eat, Morton left. Around 11 p.m. he passed the station again and noticed the tow truck was back in its bay.

On the same night two park police officers on routine patrol in Fort Dupont Park discovered the body of Williams lying face down on the ground having been shot three times in the back of the head. Two .38 caliber bullets fired from the same gun were found near the body and one .38 caliber bullet possibly fired from a different gun was subsequently recovered from Williams' head. An autopsy revealed that Williams had died from gun shot wounds to the head fired at close range when he was probably in the same position where he was found.

Morton testified that at approximately 3 a.m. the next morning appellant came to Morton's home in Maryland to repay him the money Head owed. According to Morton, Head stated that Williams had transported him in Williams' car and that Williams wanted to talk to Morton. Clad in his bathrobe, Morton went out to Williams' car but did not see Williams. Instead he saw two other men in the car. Morton stated that appellant, who was wearing a beige or yellow jacket, put a pistol to Morton's head and told him to get in the car or appellant would shoot him. Morton entered the right rear seat of the car and sat next to the man holding a shotgun or rifle. The man in the front seat hit Morton in the mouth with a pistol. As appellant began to drive away, Morton opened the car door next to him and dove out of the car. As Morton ran away, he could hear someone yelling, "shoot him, shoot him." No shots were fired. After running and hiding for approximately fifteen minutes, Morton reached the home of some friends; he immediately called the police and another friend who had been at his house. The police arrived and drove him back to his residence where they recovered a .30–.30 cartridge below Morton's house near the curb.

Between 4 and 5 o'clock that same morning, Lorraine Warren testified that she heard a loud shot and looked out her window to see two men walking in the direction of her house near the Kelly Miller School in Northeast Washington. One of the men, wearing a beige jacket, was carrying a rifle or shotgun. They got into a dark-colored car with a white top and sped away without turning on the lights.

At around 7 a.m. a man walking to work found a body, later identified as Angelo Rowe, lying face down on the playground of the Kelly Miller School. A detective found a flattened lead .38 caliber bullet under a hat next to the body. An autopsy later revealed that Rowe had been shot in the head with a high velocity projectile, probably in the same position where he was

found. The wound was consistent with that inflicted by a .30–.30 caliber rifle, but no rifle bullet was found.

That morning when Morton returned to his gas station he discovered that his calculator and approximately fifteen blank checks were missing. He noticed papers strewn all over his desk and fresh pry marks on the safe, which contained approximately $1,887. His rifle, a .30–.30, which he kept loaded with one round in the chamber, was also missing. A box of ammunition at the station matched the weight, caliber, and manufacturer's brand of the shell found outside Morton's home. A firearms expert at trial also testified that markings on one cartridge in the box showed that it had been worked through the action of the same weapon as the cartridge found outside Morton's home. Rowe's car was also found at the station.

The police located Williams' car later that day one block from the residence of appellant's former girlfriend, who testified that she had not seen him for five years prior to trial. A detective found Morton's missing calculator under the right front seat of the car.

Appellant presented an alibi defense that on the evening of December 4, he attended a poker game hosted by John Alston at Robert Staley's house in Maryland. Testifying for the government, Alston explained that appellant arrived at the poker game at approximately 8 or 9 p.m., left shortly thereafter, and returned thirty to forty minutes later with a .38 caliber pistol which he asked Alston to keep for him. Alston unloaded it and found two spent shells and one shell lighter in weight with a flat head. Appellant asked Alston for ammunition which Alston refused to give him. Taking his gun, appellant departed within a period of forty-five minutes to an hour. He returned between 1 and 2 a.m., and played poker for approximately forty-five minutes.

Another government witness, Lorretta Blackstone, testified that appellant was at Staley's house that evening, but that he left and did not return for one or two hours. Upon returning, he played poker for a few

minutes and left again. She said that she stayed until the game ended and arrived home at around 2:30 a.m.

## II

First, appellant argues that the delay between arrest and trial denied him his Sixth Amendment right for speedy trial. Governing our review is the four-pronged test enunciated in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), under which we weigh the length of the delay, the reasons for the delay, the appellant's assertion of the right, and the prejudice to him.

■ The length of delay was slightly less than thirty months, dating from appellant's arrest on December 6, 1977 and extending until trial on June 2, 1980. Where, as here, the delay exceeds one year, appellant has established a prima facie constitutional violation. *Asbell v. United States,* D.C.App., 436 A.2d 804, 812 (1981); *Branch v. United States,* D.C.App., 372 A.2d 998, 1000 (1977). Accordingly, the government must "convincingly outweigh" appellant's assertions of a denial of his Sixth Amendment right. *Warren v. United States,* D.C.App., 436 A.2d 821, 834 (1981); *Day v. United States,* D.C.App., 390 A.2d 957, 970 (1978). However, the more complex and serious the charges, the easier it is for the government to meet that burden. *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192; *Strickland v. United States,* D.C.App., 389 A.2d 1325, 1329 (1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979).

■ In examining the reasons for the delay, we must impose responsibility on the government for delays due to court congestion and judicial deliberation, but we weigh these more neutral reasons for delay less heavily against the government than deliberate tactics to delay. *See Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192; *Warren v. United States, supra* at 834; *Day v. United States, supra* at 965. In the instant case, the nine months and one week from arrest on December 6, 1977 until indictment on September 13, 1978 are attrib-

utable to the government.[5] At least part of this period is a neutral delay inherent in the operation of the court and grand jury system. *See Turner v. United States,* D.C. App., 443 A.2d 542, 546 (1982); *Day v. United States, supra* at 966. In addition, this period is partially attributable to investigative delay, which differs fundamentally from delay undertaken solely "to gain tactical advantage over the accused." *See United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

■ Of the remaining twenty and one-half months, a congested court docket accounted for thirteen and one-half months of delay, which is attributable to the government. However, six of those months resulted from continuances which were recorded with the consent of appellant: the continuance from January 11, 1979 to February 12, 1979 and the continuance from April 16, 1979 to September 17, 1979. Appellant's concurrence causes this court to accord minimal weight to that six-month delay. *See Campbell v. United States,* D.C. App., 391 A.2d 283, 286 (1978); *Reed v. United States,* D.C.App., 383 A.2d 316, 319, *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978). The prosecutor's illness on February 12, 1979 caused a two-month delay, which is also attributable to the government, although not the result of a deliberate tactic.

The remaining five months are attributable to appellant: three months due to his counsel's hospitalization on the trial date of November 19, 1979; and two months from February 12 to April 17, 1980, in which he waived his speedy trial right to enable his new counsel to prepare the case;[6] plus a few additional days during May and June in which his counsel requested a continuance due to a conflict in his schedule. Thus, most of the nearly thirty-month delay is attributable to neutral institutional factors,

and there is no indication that the government made a deliberate tactical decision to delay the trial.

Reviewing appellant's assertion of his right to a speedy trial, we find that he did so several times: October 26, 1978, September 17, 1979, and June 2, 1980.[7] The early assertion of a speedy trial right is an extremely important factor entitled to strong evidentiary weight. *Barker v. Wingo, supra* 407 U.S. at 531, 92 S.Ct. at 2192; *Bethea v. United States,* D.C.App., 395 A.2d 787, 792 (1978).

■ The final factor, prejudice to appellant, is assessed in light of certain interests, which the Speedy Trial Clause protects: (1) preventing undue and oppressive pretrial incarceration; (2) lessening the accused's anxiety and concern; and (3) limiting the possibility that a long delay will impair his defense. *See Barker v. Wingo, supra* 407 U.S. at 532, 92 S.Ct. at 2192; *United States v. Marion, supra* 404 U.S. at 320, 92 S.Ct. at 463; *Campbell v. United States, supra* at 286. A defendant need not affirmatively demonstrate prejudice to prevail on speedy trial grounds where there has been excessive delay. *Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973); *Warren v. United States, supra* at 835. However, if a defendant does not assert any prejudice, the government can argue the facts of record and inferences drawn from the defendant's failure to do so. *Asbell v. United States, supra* at 814; *Day v. United States, supra* at 971. Thus, significant delay alone, although chargeable to the government but not resulting from a deliberate tactic to gain an advantage, does not violate the speedy trial clause. *Asbell v. United States, supra* at 814; *Day v. United States, supra* at 973.

---

5. The period between arrest and indictment must be considered in evaluating a speedy trial clause claim. *United States v. MacDonald,* —— U.S. ——, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982); *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975).

6. Notations on the case jacket specifically state that appellant waived his speedy trial right for this two-month period.

7. Prior to his indictment appellant also filed a motion to dismiss for lack of prosecution on September 13, 1978.

■ In the instant case appellant was released on bond on January 6, 1978, one month after his arrest. He alleges that he suffered anxiety from several repeated arrests following the initial one [8] and from questioning of his girlfriend and his wife. He also alleges his incarceration hampered case preparation and that his memory and those of certain alibi witnesses have faded over time.

When considering faded memories or difficulties in case preparation, the court is in the realm of speculation. *Asbell v. United States, supra* at 814. Appellant specifically argues that he was unable to locate the night clerk at his residence who could have testified as to the time he arrived home. Even if the clerk's testimony would have corroborated Head's testimony that he arrived home between 6 and 6:30 a.m. on December 5, 1977, that testimony does not elucidate Head's whereabouts earlier that morning or on the previous evening when Rowe and Williams were killed. Appellant also specifically alleges that he would have called another alibi witness, if that witness' memory had not faded over time. However, at a post-trial hearing, that witness testified that his estimates of time at the poker game would have been incorrect by a half an hour even on the day after the game. It is mere speculation to conclude that those estimates would have become more inaccurate over time. Similarly speculative are appellant's allegations that the memories of his other witnesses also faded over time. Thus, while appellant may have suffered some prejudice from his anxiety, we do not find that his defense was impaired, or that he suffered undue pretrial incarceration.

Balancing these factors, we conclude that the government has met its burden of refuting appellant's prima facie case. Of the twenty-nine and a half month delay, almost all of it is chargeable to the government due to neutral institutional reasons or investigative delay. The delay is offset, however, by the complicated nature of the charges and the minimal prejudice which appellant suffered. In addition, despite his early assertion of his speedy trial right, he concurred in continuances totalling six months and caused a five-month delay himself. Consequently, we hold that the delay in this case did not constitute a Speedy Trial Clause violation warranting dismissal of the indictment.

### III

■ Appellant also argues that there was insufficient evidence to support his convictions. Upon review of the evidence, this court must determine whether there was sufficient evidence from which a reasonable juror could fairly conclude guilt beyond a reasonable doubt. *E.g., Fox v. United States,* D.C.App., 421 A.2d 9, 13 (1980); *Curley v. United States,* 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). In doing so, the court does not distinguish between direct and circumstantial evidence. *See Jackson v. United States,* D.C.App., 395 A.2d 99, 102 (1980); *Byrd v. United States,* D.C.App., 388 A.2d 1225, 1229 (1978). Rather we must view the evidence in the light most favorable to the government, recognizing the jury's right to determine credibility of witnesses, weigh the evidence, and draw justifiable inferences of fact. *Clark v. United States,* D.C.App., 418 A.2d 1059, 1060 (1980); *Byrd v. United States, supra* at 1229. This court will reverse a conviction only where there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt. *Dunham v. District of Columbia,* D.C.App., 442 A.2d 121, 128 (1982); *Cunningham v. United States,* D.C. App., 408 A.2d 1240, 1242 (1979). The evidence must support an inference, rather than mere speculation, as to each element of an offense. *Smothers v. United States,* D.C.App., 403 A.2d 306, 312 (1979). In the instant case, we will review each conviction in turn.

**8.** Appellant alleges that he was arrested 15 or 16 times subsequent to his release on January 6, 1978.

PREMEDITATED MURDER WHILE ARMED

To establish first-degree premeditated murder while armed, the government must prove, among other things, that the accused committed the crime intentionally with premeditation and deliberation while armed. *E.g., Frendak v. United States,* D.C.App., 408 A.2d 364, 371 (1979); *see* D.C.Code 1973, §§ 22–2401, –3202. Although the evidence is primarily circumstantial, it is sufficient for a jury to find that appellant did the acts alleged. There was testimony that he returned to the poker game on the evening of December 4, 1977, sometime between 8:30 and 10 p.m. with a .38 caliber pistol and two empty shells. Williams, whose body was discovered at 10:30 that night, was killed with a .38 caliber weapon. Appellant unsuccessfully sought to obtain more ammunition from Alston and then left the poker game, taking his pistol with him. A .38 caliber bullet with a flattened head was recovered from a hat found next to Rowe's body. A few hours before the body was found, a woman, who had heard a loud shot, observed a man carrying a shotgun or a rifle and another man walking away from the direction of Kelly Miller playground and enter a car similar to Williams' and drive away without turning on the lights. The driver, who had been carrying the shotgun or rifle, was wearing a tan jacket, which was the color of appellant's jacket. Williams' car was located the next morning one block from the residence of appellant's former girlfriend and a few blocks from the barbershop where he worked.

Introduced to show common scheme or plan, motive, and identity was evidence of appellant's alleged abduction of Morton in the early morning of December 5, 1977. Driving Williams' car, which had not been at the gas station since before 9:50 p.m. the previous evening, appellant drew Morton out of his house on the pretext of talking to Williams, who had already been killed.

Establishing premeditation requires a showing that the defendant gave " 'thought, before acting, to the idea of taking a human life and [reached] a definite decision to kill.' " *Frendak v. United States, supra* at 371 (quoting *United States v. Sutton,* 138 U.S.App.D.C. 208, 216–17, 426 F.2d 1202, 1210–11 (1969) (footnote omitted)). Proof of deliberation requires evidence that the defendant acted with " 'consideration and reflection upon the preconceived design to kill; turning it over in the mind, giving it second thought.' " *Id.* A jury may infer premeditation and deliberation from sufficiently probative facts and circumstances. *Harris v. United States,* D.C.App., 375 A.2d 505, 508 (1977). However, evidence must show the accused reached a decision to kill calmly and in cold blood, not on impulse or in the heat of passion. *Id.*

In this case there is sufficient evidence upon which a reasonable juror could find appellant acted with premeditation and deliberation. According to the government's evidence, appellant arrived at the poker game around 8 or 9 p.m. on December 4, 1977, asked whose game it was, left shortly thereafter and subsequently returned twice. He played poker for about 45 minutes to an hour before leaving the final time early in the morning of December 5, 1977. From this evidence the jury could reasonably infer that Head was establishing an alibi by arriving before both the murders and then strengthened the alibi by returning to the poker game in between the two killings. The evidence concerning the location and condition of the bodies of both Rowe and Williams similarly supports an inference of premeditation and deliberation. The fact that both were shot in the head, probably at close range as they lay face down on the ground gives rise to an inference of a calculated plan rather than an impulsive act.

Appellant's possession of a .38 caliber pistol with spent shells at the poker game, and his request for additional ammunition similarly give rise to the same inference. Evidence of Head's attempted abduction of Morton in Williams' car after Williams' body was found and before Rowe's body was found is evidence of a calculated plan from which the jury could infer premeditation and deliberation for the murder of Rowe.

ARMED KIDNAPING

■ The elements of armed kidnaping require, among other things, a showing that appellant while armed seized or detained the victim. D.C.Code 1973, §§ 22–2101, –3202. The involuntary nature of the seizure and detention is the essence of the crime of kidnaping. *Smothers v. United States, supra* at 313; *United States v. Wolford,* 144 U.S.App.D.C. 1, 8, 444 F.2d 876, 883 (1971); *see Chatwin v. United States,* 326 U.S. 455, 464, 66 S.Ct. 233, 237, 90 L.Ed. 198 (1946). In *Smothers,* this court found there was insufficient evidence to support an inference that a woman, who was later raped and killed at St. Elizabeths Hospital, had been taken from one place to another against her will. *Id.* at 313. The court so held despite evidence that she was at or near Iverson Mall, that she intended to go to her sister's house, that appellant said he wanted to take his uncle's pistol to the mall to rob women there, that he admitted he shot a woman, and that he subsequently used her car and watch. *Id.* We stressed that there were no signs of a struggle in the car and that the victim suffered all her injuries immediately before death, according to medical evidence. *Id.*

■ In the instant case the government has not introduced either direct or circumstantial evidence that the taking of Williams and Rowe from one place to another was against their will. Morton's gas station, although only partially closed for the night, was locked, the lights were turned off and there was no sign of a struggle there. Nor was there any indication of a struggle in Williams' car or any evidence that Rowe and Williams left the station other than voluntarily. Accordingly, we reverse the convictions for four counts of armed kidnaping.

ARMED ROBBERY

■ A conviction for armed robbery requires a showing of a taking of property of value while armed from the immediate actual possession of another against his will by force or violence or by putting in fear. *Rouse v. United States,* D.C.App., 402 A.2d 1218, 1220 (1979); *Hawkins v. United States,* D.C.App., 399 A.2d 1306, 1308 (1979); *see* D.C.Code 1973, §§ 22–2901, –3202. Immediate actual possession refers to the area within which the victim can reasonably be expected to exercise some physical control over the property. *United States v. Spears,* 145 U.S.App.D.C. 284, 293, 449 F.2d 946, 955 (1971); *see Rouse v. United States, supra* at 1220; *Jones v. United States,* D.C.App., 362 A.2d 718, 719 (1976).

■ Our inquiry then is whether a reasonable juror could find beyond a reasonable doubt that appellant participated in the armed robbery of Williams and Rowe. Taking into account the circumstances already described surrounding the deaths of the two victims, we note that the two men were the only employees on duty at the gas station on the night of December 4, 1977. Some time that evening the station was locked, and the keys to it were found with Rowe. There is no evidence that someone broke into it after it was locked. A juror could reasonably infer that the calculator and rifle, normally kept at the station, were taken from the possession of Rowe and Williams. The station owner, Morton, gave explicit testimony that, during the early hours of the next morning, appellant, armed with a pistol, forced him into the car owned by Williams and attempted to abduct him. Another occupant of the car possessed a rifle similar to the one stolen. A short time later, the owner's calculator was recovered from the same vehicle which had been abandoned one block from the residence of one of appellant's acquaintances.

■ In addressing this aspect of the case, our major difference with our dissenting colleague seems to turn on the impact or legal sufficiency of the circumstantial evidence relied upon as to this charge. Although there was no prosecution witness who could testify directly about the robberies, there was nonetheless clear evidence, amid violent circumstances, of a corpus delecti. The property was taken and carried away. Appellant was seen driving the car

belonging to one of the victims and in possession of the stolen calculator at a time proximate to the alleged offenses. We think this is a case where it is important to reiterate that circumstantial evidence may be equally as probative as direct evidence, *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 139, 99 L.Ed. 150 (1954); *Chaconas v. United States,* D.C.App., 326 A.2d 792, 797 (1974), particularly where appellant, as here, was shown to be in possession [9] of property recently stolen. This "inference of ancient vintage," *Pendergrast v. United States,* 135 U.S.App.D.C. 20, 31, 416 F.2d 776, 787, *cert. denied,* 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969), though more generally associated with larceny offenses, has also been applied, to a lesser degree, in cases involving robbery and burglary. *Id.* 135 U.S.App.D.C. at 64, 416 F.2d 776; *cf. White v. United States,* D.C.App., 300 A.2d 716 (1973).[10] Viewing the total circumstances in this case, we are not convinced on this record that no juror could reasonably find guilt.

It is not unusual and we find no inconsistency in the fact that, in any indictment of multiple counts, the prosecutor is sometimes able to prove the elements of some of the charges but not all of the crimes charged. In this instance, following the limiting decisions of this court, we have simply ruled that the government proved robbery but not kidnaping. That is not uncommon or legally inconsistent.

FELONY MURDER WHILE ARMED

The essential elements of felony murder while armed are that the defendant, while perpetrating or attempting to perpetrate a specified felony while armed, inflicted an injury on the victim from which he died. *Waller v. United States,* D.C.App., 389 A.2d 801, 807 (1978); *see* D.C.Code 1973,

§§ 22–2401, –3202. This requirement of an underlying felony operates as a mechanism by which the jury can infer the state of mind required for first-degree murder. *Waller v. United States, supra* at 809. In this case the trial court instructed the jury that they must find that appellant inflicted injuries on Williams and Rowe, from which they died, while perpetrating or attempting to perpetrate robbery and kidnaping. Because of our holding that there was insufficient evidence to sustain the kidnaping convictions, we must consider the elements of the offense in light of the underlying felony of robbery.

There must be evidence sufficient to support a jury finding that the murder took place during the course of the robbery. *Womack v. United States,* D.C. App., 339 A.2d 37 (1975). However, the mere coincidence in time of a robbery and a murder is insufficient to support a felony murder conviction. *United States v. Bolden,* 169 U.S.App.D.C. 60, 66, 514 F.2d 1301, 1307 (1975); *United States v. Heinlein,* 160 U.S.App.D.C. 157, 168, 490 F.2d 725, 736 (1973). We also note that the crime of robbery is a continuing offense as long as the asportation of the goods continues. *Clark v. United States, supra* at 1062.

Given our view of the robbery convictions, we believe there is sufficient evidence connecting the robberies to the deaths to sustain the jury's findings in this regard.

IV

Appellant also challenges the court's instructions to the jury on the question of aiding and abetting. In appellant's view, there was no basis in the evidence to support that theory of the case.

---

**9.** "Exclusive possession" in this context is something less than the traditional legal concept, but rather "a relationship to the stolen property that is ... significantly distinguishable from the connection that others bear to the property." *United States v. Johnson,* 140 U.S. App.D.C. 54, 59, 433 F.2d 1160, 1165 (1970).

**10.** We acknowledge that the jury was not given this instruction. That, however, does not de-

tract from the circumstances which the jury did hear. The permissible inference that one in possession of recently stolen property may be deemed to have stolen it, is but another form of circumstantial evidence. Even without articulation of the principle by the court, the jury was entitled to consider the situation which was presented.

Generally, an individual who knowingly participates in the commission of a criminal act by assisting the principal with guilty knowledge is deemed equally responsible. *Byrd v. United States,* D.C. App., 364 A.2d 1215, 1219 (1976); *In re J.W.Y.,* D.C.App., 363 A.2d 674, 679 (1976). The indictment need not include a charge of aiding and abetting for the judge to give that instruction. *Mason v. United States,* D.C.App., 256 A.2d 565, 567 (1969); *United States v. Boone,* 177 U.S.App.D.C. 265, 266, 543 F.2d 412, 413 (1976). However, where the government proceeds against a defendant as a principal and at the close of the evidence successfully requests an aiding and abetting instruction, reversal may be required where the evidence of a principal is vague. *Payton v. United States,* D.C.App., 305 A.2d 512, 513 (1973). On the other hand, if there is clear and convincing evidence that the defendant was present and participating in the crime, a trial court's instruction on aiding and abetting does not mislead the jury or require reversal. *Hackney v. United States,* D.C.App., 389 A.2d 1336, 1343–44 (1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979). The rationale for this rule is that where there is convincing evidence of a defendant's participation, the jury instructions are not inconsistent "since the greater participation in the offense includes the lesser and the legal effect is the same." *Id.*

In this case there was evidence of two other men in Williams' car with appellant during the attempted kidnaping of Morton. There was also testimony from the eyewitness who heard a shot and saw two men walking from the direction of the Kelly Miller playground where Rowe's body was found. Thus, although appellant was not directly identified as the actual killer, the jury could infer from the evidence that appellant was present and participated in the murders and robberies. Although this evidence tended to prove that appellant was a principal, an aiding and abetting instruction was not error. The prosecutor did not contend that they could prove that appellant personally committed each of the acts necessary to constitute the offenses charged. As we said in *Hackney,* "[i]n a practical sense, each of the three killers was an aider and abettor, because the evidence tended to prove that appellant and his companions all committed overt acts which caused the deaths...." *Id.* at 1343. On balance, this instruction simply allowed the jury to consider whether appellant, as one of three persons clearly implicated, could be deemed responsible as a principal offender or one who was aiding or assisting others.

V

Appellant's final allegation of error concerns the admission of evidence concerning the alleged abduction of Morton in the early morning hours of December 5, 1977. It is a general rule that evidence of other crimes committed by a defendant is inadmissible except for specific, limited purposes. *See, e.g., Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). In addition, where the probative value of the other crimes evidence outweighs its prejudicial effect, this court has admitted such evidence to explain the immediate circumstances surrounding the offense charged. *See Green v. United States,* D.C.App., 440 A.2d 1005, 1007 (1982), and cases cited therein. The court will overturn the trial court's ruling on the admissibility of such evidence only for an abuse of discretion. *See Willcher v. United States,* D.C. App., 408 A.2d 67, 75 (1979); *Light v. United States,* D.C.App., 360 A.2d 479, 480 (1976).

After admitting the evidence of the alleged abduction of Morton, the trial court cautioned the jury that it could only consider the testimony as evidence of a common scheme or plan, identity and motive. The trial court, in a pretrial ruling, had also expressly found the probativity of the evidence outweighed its prejudicial effect. We do not think the trial court abused its discretion in admitting the evidence. Due to the highly circumstantial nature of the evidence in this case, the probative value of the alleged abduction is high. It also helps complete the picture of the events that

occurred following the time Williams' body was found and prior to the time Rowe's body was found. Although the evidence contradicts appellant's alibi, the resulting prejudice does not outweigh its probative value. Accordingly, we affirm the trial court's admission of the evidence for the purposes specified.

In sum, we reverse and vacate the convictions for armed kidnaping; we affirm the other convictions.

*Affirmed in part; reversed in part.*

KELLY, Associate Judge, dissenting in part:

I cannot agree with those sections of the majority opinion which affirm the two counts of armed robbery (from Williams a rifle, calculator, and car; from Rowe a rifle and calculator) and the two counts of felony murder while armed.

On the one hand, in reversing the two counts of kidnaping while armed with intent to steal and the two counts of kidnaping while armed with intent to assault, a decision in which I concur, we find that

In the instant case the government has not introduced either direct or circumstantial evidence that the taking of Williams and Rowe from one place to another was against their will. Morton's gas station, although only partially closed for the night, was locked, the lights were turned off and there was no sign of a struggle there. Nor was there any indication of a struggle in Williams' car or any evidence that Rowe and Williams left the station other than voluntarily.... [*Ante* at 624.]

On the other hand, the majority finds sufficient circumstantial evidence of armed robbery because, "Taking into account the circumstances already described surrounding the deaths of the two victims, we note that the two men were the only employees on duty at the gas station on the night of December 4, 1977. Some time that evening

the station was locked, and the keys to it were found with Rowe. There is no evidence that someone broke into it after it was locked." *Ante* at 624. It then surmises a jury could infer that the calculator and rifle were taken from the possession of Rowe and Williams. This, plus Morton's attempted abduction, amounts to "clear evidence, amid violent circumstances, of a corpus delecti." *Ante* at 624. I do not agree. To me, given all the circumstantial evidence the majority can identify, no reasonable juror could infer beyond a reasonable doubt that appellant feloniously carried away the items alleged to have been stolen with force and violence, much less by force of arms.

The attempt to apply an ancient inference, possession of recently stolen property,[1] to support the robbery convictions fails in two respects. First, the theory appears for the first time in the majority opinion; it was not relied upon by the government and the jury was not told of it. Second, the inference is not permissible to prove an armed robbery; rather it permits an inference of identity of the person who committed a proven robbery. *White v. United States,* D.C.App., 300 A.2d 716 (1973); *Pendergrast v. United States,* 135 U.S.App.D.C. 20, 31, 416 F.2d 776, 787, *cert. denied,* 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969). Accordingly, I would reverse the convictions for armed robbery.

Absent the armed robbery convictions, the felony murder convictions must fail as well. Even if I am mistaken in my view that there was insufficient evidence of armed robbery, however, the felony murder conviction as to Rowe, who was killed at least five hours after the robbery took place, cannot be supported. The principal circumstance cited by the majority to link appellant to a robbery is the kidnaping of Morton in Williams' car. Rowe was not present in the car.[2] The evidence, suggesting as it does only that Rowe was killed long after the alleged robbery took place,

---

1. No one was ever seen in possession of the calculator.

2. The government's suggestion that the jury could thus infer that Rowe was in the trunk of the car does not merit discussion.

does not support a felony-murder conviction based on an underlying robbery conviction. The case cited by the majority to say that robbery is a continuing offense deals with the immediate pursuit of a felony suspect.[3] It is not on point; it cannot apply to the circumstances of this case.

Giving the aiding and abetting instruction, in my analysis of the case, is also suspect. I do not discuss the issue since my judgment is that the error, if any, was harmless. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

---

**3.**  *Clark v. United States,* D.C.App., 418 A.2d 1059 (1980). *See also Coleman v. United States,* 111 U.S.App.D.C. 210, 295 F.2d 555 (1961), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689,

7 L.Ed.2d 613 (1962); *Carter v. United States,* 96 U.S.App.D.C. 40, 223 F.2d 332 (1955), *cert. denied,* 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827 (1956).