*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-444

EMERO SANCHEZ TORNERO, APPELLANT,

06/22/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF1-4009-11)

(Hon. Ronna L. Beck, Trial Judge)

(Argued January 21, 2016                          Decided June 22, 2017)

*Joshua Deahl*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Sharon Donovan,* and *Lindsay Suttenberg*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, *Associate Judge*, and WASHINGTON[*] and REID, *Senior Judges*.

WASHINGTON, *Senior Judge*:    On June 7, 2011, a grand jury indicted Emero

---

[*]    Judge Washington was Chief Judge at the time of argument.    His status changed to Senior Judge on March 20, 2017.

Sanchez Tornero ("Appellant") on several counts related to three separate incidents of kidnapping and sexual assault occurring in May 2005, January 2006, and November 2008 involving R.G., N.R., and C.A., respectively.[1] On January 7, 2013, a jury convicted appellant on all but one count of second-degree sexual abuse related to C.A. Appellant challenges the trial court's denial of his motion to sever the trials and contends that the trial court lacked jurisdiction over the rape of C.A. Appellant also contends that the government failed to introduce sufficient evidence to sustain his convictions for the rape of R.G. and the kidnapping of C.A.

We agree with appellant that the trial court erred in denying his motion to sever the trials. We conclude that the error was not harmless with respect to

---

[1] As to R.G., appellant was charged with two counts of kidnapping, for R.G. and her daughter (D.C. Code § 22-2001 (2012 Repl.)) and one count of first-degree sexual abuse of R.G. with aggravating factors (D.C. Code §§ 22-3002 (a)(1)-(2), -3020 (a)(5) (2012 Repl.)). As to N.R., appellant was charged with armed kidnapping (D.C. Code §§ 22-2001, -4502) (2012 Repl.), two counts of attempted armed first-degree sexual abuse with aggravating circumstances (D.C. Code §§ 22-3002 (a)(1)-(2), -3018, -4502, -3020 (a)(5)-(6) (2012 Repl.)), armed third-degree sexual abuse with aggravating circumstances (D.C. Code §§ 22-3004 (1)-(2), -4502, -3020 (a)(5)-(6) (2012 Repl.)), armed first-degree sexual abuse with aggravating circumstances (D.C. Code §§ 22-3002 (a)(1)-(2), -4502, -3020 (a)(5)-(6) (2012 Repl.)), and four counts of possession of a firearm during a crime of violence ("PFCV") (D.C. Code § 22-4504 (b) (2012 Repl.)). As to C.A., appellant was charged with kidnapping and three counts of second-degree sexual abuse with aggravating circumstances (D.C. Code §§ 22-3003 (2), -3020 (a)(5) (2012 Repl.)).

appellant's convictions in the R.G. case and reverse his convictions for the kidnapping and sexual assaults of R.G. because the evidence of appellant's guilt was insufficient. With regard to the C.A. case, we reverse appellant's convictions for the kidnapping and sexual assault of C.A. because the trial court lacked jurisdiction over those charges. Finally, although appellant should have been granted a separate trial on the charges involving N.R., the denial of his severance motion did not prejudice him with respect to those charges; we, therefore, affirm his convictions relating to N.R.

## I. Factual Background

These consolidated cases arose out of a series of kidnappings and sexual assaults allegedly committed by appellant over a three-and-a-half-year period of time. The victim in each case was a female passenger who was sexually assaulted in the back seat of a taxi cab that operated in and around the District of Columbia. In each instance, the rear doors of the taxi cab could not be opened from the inside, thus preventing the women from escaping. The relevant facts particular to each of the assaults are recounted below.

**A.    The Kidnapping and Sexual Assault of R.G.**

On May 10, 2005, a 23-year-old Latina woman, R.G., and her four-year-old daughter flagged down a white taxi with black lettering at the corner of 9th & N Streets, Northwest, in Washington, D.C.   After they entered the taxi, R.G. gave her phone to the driver so that her sister could provide directions to her home in the District.   While en route, R.G. noticed that the driver was going the wrong way. R.G. called her sister again for her to provide the driver with further directions. After the driver handed the phone back to her, R.G. stayed on the line with her sister.

Suddenly, the driver pulled into a large parking lot and drove past a barrier onto a closed road.   The driver tried to grab the telephone out of R.G.'s hand as R.G. repeatedly yelled her sister's name.   Her sister heard the driver, who she said had an Ethiopian accent "or something like that," yelling at R.G. and her daughter to shut up.   Then the phone went dead.

At approximately 12:00 p.m., the cab driver stopped the car and R.G. tried to open the rear door to get out.   However, the doors would not open when she pulled the handles.   The taxi driver, who was wearing black fingerless gloves,

grabbed R.G.'s daughter around the waist and put her in the front seat of the cab. He moved into the back seat of the taxi where he forcibly removed R.G.'s pants, pulled his pants down, and put on a condom. He then forced R.G. to engage in oral sex. Later, while the driver was adjusting his condom, R.G. reached into the front of the taxi, opened the driver's side-door, and pushed her daughter out of the car. She then climbed over the front seat and escaped through the same door. She grabbed her daughter and ran to a nearby warehouse where a woman called the police for her.

R.G. described her attacker as a black male with a light-complexion, approximately 30 years of age, with thin and light facial hair, a moustache, and a beard. She later helped police create a computer-generated composite image of her attacker.[2] At no time, either inside or outside the courtroom, did R.G. identify appellant as her attacker.

**B. The Sexual Assault of N.R.**

On January 7, 2006, a 28-year-old Latina woman, N.R., went to Langley

---

[2] Appellant has a scar on the side of his face, which R.G. did not include in the composite sketch of her attacker.

Park Plaza in Hyattsville, Maryland, to take a taxi to work. She entered the rear of a silver car marked "taxi" and gave the driver her work address in College Park, Maryland. N.R. soon realized that the car was heading towards D.C. and not College Park. When N.R. told the driver he was going the wrong way, he simply turned up the radio. When they stopped at a red light, N.R. tried to open the rear doors and windows but could not.

The assailant drove to an isolated warehouse in the District and parked the car. He reached into a bag, removed a sheathed dagger, pulled the dagger out of the sheath, and then pulled out a medium-sized, dark handgun with "brown tones." He then put on black fingerless gloves and moved to the back seat, pointed the gun at N.R., and told her to remove her boots and jacket, speaking with an "African or Jamaican" accent. N.R. removed all of her clothing and the assailant put on a condom.

The assailant then tried to force N.R. to have oral sex with him but she was able to resist his efforts. He forced her to lie down and he had vaginal intercourse with her. After the assailant satisfied himself, he removed the condom and placed it in a brown bag. He then placed his hands and mouth on her breasts.

After the assailant got back into the driver's seat and while N.R. was getting dressed, he drove N.R. to College Park, Maryland where he pulled into a laundromat parking lot. The assailant got out of the car and opened the rear door so N.R. could get out. N.R. could not find anyone to help her, so she walked to work and called her aunt, who then called the police. N.R.'s supervisor testified that she was crying and that she said that a taxi driver had raped her.

When the police arrived N.R. described her attacker, whom she identified at trial as appellant, for a composite drawing. At trial, she described her assailant as "somewhat tall, thin . . . a beard, not much of one . . . and then on the side of his face, I don't remember which side, he had, like, something on his face." The report of the Sexual Assault Nurse Examiner ("SANE") who examined N.R. and prepared the rape kit noted that while N.R. had an abrasion at the bottom of her vaginal canal, no semen was found in or on N.R.'s body. However, appellant was identified as the sole source of male DNA recovered from nipple swabs performed on N.R.'s breasts.

## C. The Sexual Assault of C.A.

On November 28, 2008, C.A. and her sister went to The Park nightclub in

D.C. They arrived at The Park between 10:30 p.m. and midnight and continued drinking with three men they met at the club. By around 1:00 a.m., C.A. was so visibly drunk that a security guard asked the two sisters to leave the Club. C.A. became upset, started arguing with her sister, and then left the club without her. Her sister tried calling C.A. on multiple occasions but C.A. never said more than "Hello."

Sometime later that morning, C.A. awoke in the back seat of a taxi cab that was lined with newspapers. No one else was in the car. She testified that the door near her feet was open and that she saw a person standing there, however, shortly thereafter, she passed out again. She next remembers waking up in the same taxi as a male voice from the front driver's side of the taxi called her name. C.A. did not see the man but she heard him say that he would be back in thirty minutes and she also heard him say something about the Metro opening. After he closed the door, C.A. sat up to look for her purse. She noticed that the meter on the taxicab read $103. She could not find her purse, but she found her cell phone. She was missing her underwear and felt severe pain in her vaginal area. C.A. tried to open the back doors of the taxi by lifting the handles but the doors would not open.

C.A. called her sister at approximately 6:00 a.m. and told her that she was missing her purse and underwear and that she thought someone had sex with her. Somehow C.A. got out of the taxi and was helped by a male passerby into a nearby Days Inn so she could call the police. The man then went back outside to canvas the area and noticed that the taxi was gone and the newspaper had been thrown onto the ground.

C.A. was taken to the hospital but could not remember what had happened to her. A testing of C.A.'s blood sample revealed that her blood alcohol level at that time was .08. C.A. had several injuries in her vaginal area.[3] DNA testing revealed the presence of sperm and that appellant was the sole source of male DNA recovered from the vaginal and anorectal swabs. The swabs from C.A.'s mouth revealed DNA from two male contributors, including appellant. The stains on the front of C.A.'s coat were found to contain semen, with appellant being the major contributor.

Cell phone records established that by 2:17 a.m. C.A. had traveled outside of

---

[3] A sexual assault expert testified that the injuries were extensive and that she had observed such extensive injuries in fewer than 10% of all the rape cases she had reviewed in her twenty years of experience.

the District and into Hyattsville, Maryland.[4] At 6:15 a.m., C.A.'s phone pinged a cell tower near the Days Inn in Alexandria, Virginia, and did so until 7:38 a.m. when C.A. called 9-1-1. Cell tower information placed appellant near The Park club at 9:47 p.m. and near the Days Inn in Alexandria, at 6:40 a.m.

### D. Other Evidence

In addition to the testimony of the victims and the introduction of the medical evidence, the government also presented Antonio Medina, who testified that he flagged down a taxi that appellant was driving on June 22, 2008, at the corner of Seventh and G Streets, Northwest but that when he arrived at his home he tried to get out of the backdoor of the taxi, but could not open the doors. The government also presented evidence that appellant operated different color and model taxi cabs.

Appellant called two detectives to highlight inconsistencies in R.G. and C.A.'s statements to officers and called a PDS investigator to highlight

---

[4] C.A.'s cell phone pinged near a cell tower at 6319 Old Landover Road Hyattsville, Maryland, approximately 1.6 miles away from appellant's U-Store locker. The evidence, however, established that appellant had not keyed into his storage unit during the hours in question.

inconsistencies in N.R.'s statements to the investigator. Appellant also called the manager of his storage locker in Maryland to testify as to the times that his locker was accessed. Finally, the parties entered into a number of stipulations, the majority of which referred to further inconsistencies in N.R.'s statements to investigators and a stipulation that C.A.'s cell phone number was listed in one of appellant's cell phone under the letter "C." Appellant did not testify.

## II. Appellant's Severance Motion

Before trial, appellant moved to sever the counts against him arguing that evidence of the three offenses were not mutually admissible because the offenses were not so similar and unique as to constitute a "signature." He also contended that it would be improper to admit evidence of the other alleged kidnappings and sexual assaults in the R.G. case because he was not contesting identity in either of the other two cases. Therefore, the evidence was being offered only to show propensity. Further, he argued that the evidence was not mutually admissible to show intent because intent would not be an issue in any of the cases pending against him and because of his proposed defenses to each of the alleged crimes of kidnapping and sexual abuse, *i.e.*, misidentification in the R.G. case, fabrication of the sexual intercourse and of the weapon in the N.R. case, and consent in the C.A.

case. In addition, appellant argued that the second-degree sexual assault charge for anally raping C.A. carries no specific intent requirement.

In response, the government argued that the "other crimes evidence" was "mutually admissible" to establish appellant's identity in each case because the three offenses were so similar in character that the crimes constituted a "signature." Further, the government argued that the other crimes evidence was admissible to prove appellant's motive and intent to rebut appellant's claim of a lack of force.

The trial court denied appellant's severance motion, agreeing with the government that the evidence of the three separate sexual assaults was "mutually admissible" to prove identity because "there [was] a reasonable probability that the same person committed all three crimes due to the concurrence of unusual and distinctive facts." According to the trial court, identity was at issue in all of the cases because appellant refused to stipulate that he was the person who engaged in sex with N.R. and C.A. despite the fact that appellant's DNA was recovered from the bodies of both of them and, in both cases, appellant's defenses of fabrication of sexual intercourse and consent were not inconsistent with his presence. The trial court further found that the government had presented clear and convincing

evidence that appellant kidnapped and sexually assaulted R.G based on the similarities between the composite drawing constructed from R.G. and N.R.'s description of her assailant and appellant's appearance and on the similar circumstances between the N.R., C.A., and R.G. cases. The trial court ruled that the evidence of that offense was admissible to show intent in the C.A. case. On appeal, appellant contends that the trial court abused its discretion when it denied his severance motion because the joinder of those three cases resulted in compelling prejudice against which appellant was not protected by the court.

"We have long recognized that '[a] motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court.'" *Bailey v. United States*, 10 A.3d 637, 642 (D.C. 2010) (quoting *Arnold v. United States*, 511 A.2d 399, 404 (D.C. 1986)). Thus, the trial court's decision to deny a severance motion "may be reversed only upon a clear showing of abuse of discretion." *Id.* (citations omitted). To establish that the trial court abused its discretion, appellant "must show the most compelling prejudice, from which the court would be unable to afford protection if the offenses were tried together." *Id.* "A motion for severance should be granted for offenses of similar character unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the

evidence of each of the joined crimes would be admissible at the separate trial of the others." *Bond v. United States*, 614 A.2d 892, 895 (D.C. 1992) (internal quotation omitted). Here, the trial court could only have relied on the latter exception as a basis for denying appellant's motion for severance because the government did not seek to present separate and distinct evidence to prove each offense, but instead sought to use the evidence of each offense to prove appellant guilty of all of them.

To determine whether evidence of each of appellant's joined crimes would have been admissible at the separate trial of the others, we look to the mutual admissibility doctrine established by *Drew v. United States* and its progeny.[5] 331 F.2d 85 (D.C. Cir. 1964). Before a court may admit other crimes evidence, the government must first establish, *inter alia*, that the defendant committed the other offense by clear and convincing evidence. *See Legette v. United States*, 69 A.3d 373, 379 (D.C. 2013) (citing *Roper v. United States*, 564 A.2d 726, 731 (D.C. 1989)). Thus, in order to overcome appellant's motion for severance, the government must establish that appellant committed the sexual assaults against

---

[5] Under *Drew*, evidence of other crimes is generally admissible when relevant to prove motive, intent, the absence of mistake or accident, a common scheme or plan, and identity. *Legette v. United States*, 69 A.3d 373, 379 (D.C. 2013) (citing *Drew*, 331 F.2d at 90).

each of the victims individually by clear and convincing evidence. We are satisfied that the government met its burden of presenting clear and convincing evidence that appellant kidnapped and sexually assaulted both N.R. and C.A. based largely on the DNA evidence connecting appellant with those assaults. Nevertheless, the trial court erred in finding that there was clear and convincing evidence that appellant was involved in the kidnapping and sexual assault of R.G.

In making its finding that there was clear and convincing evidence that appellant committed the sexual assault against R.G. the trial court relied on what it believed were similarities between the composite drawing from the R.G. and N.R. assaults and appellant's appearance and, more importantly, the similarities between the sexual assaults of N.R. and C.A. to prove his identity in the R.G. case. However, for separate incidents to be admissible as proof of identity—as the trial court had done here—the "circumstances surrounding each crime [must] demonstrate[] that there is a reasonable probability that the same person committed both due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed." *See Brooks v. United States*, 448 A.2d 253, 257 (D.C. 1982) (citing *Drew*, 331 F.2d at 90). Here, we are satisfied that the evidence from the N.R. and C.A. cases was not mutually admissible in the R.G. case because the facts of the three cases are not sufficiently similar to support a

reasonable inference that they were committed by the same person.[6]

Our prior case law supports such a conclusion. In *Coleman v. United States*, 619 A.2d 40, 44 (D.C. 1993), we affirmed the trial court's denial of the appellant's motion to sever the trials in four different armed robberies. We held that the crimes were similar enough to qualify as a signature because each incident involved a man with a bicycle who accosted a lone female victim after gaining access to a secured area of an apartment building after the victim opened the door with a key or access card and they all occurred within a two-day period at locations in close proximity to each other. *Id.* at 44-45. The robber also displayed a knife in three of the four robberies and threatened a fourth victim with the fact that he was carrying a knife. *Id.* at 45.

Similarly, in *Arnold v. United States*, 358 A.2d 335, 338-39 (D.C. 1976) (en banc), we held that the two sexual assaults at issue were so similar that proof that the defendant had committed one of them would have been admissible in a separate trial. More specifically, we relied on the fact that in each case the rapist

---

[6] Similarly, because we conclude that there was no reasonable probability that based on the N.R. and C.A. cases that appellant committed the R.G. charges, the evidence in the R.G. case cannot be used to prove appellant's guilt of the N.R. and C.A. charges.

was driving a light blue Volkswagen, that he would initially express concern for his female victims before inviting them into his car, and that prior to demanding and obtaining each victim's submission to sexual intercourse, he would suddenly begin threatening them with bodily harm while accusing them of causing some injury to him or to one of his relatives. Finally, after completing each sexual assault, the appellant treated the victims kindly and drove them to their destinations. *Id.*

By contrast, in *Easton v. United States*, 533 A.2d 904 (D.C. 1987), we held that the trial court improperly denied severance. In that case, the appellant was convicted of two separate armed robberies of cab drivers. *Id.* at 904. In both instances, the "victims were middle-aged cab drivers . . . and the robber initially approached them in an ingratiating manner, . . . claimed a connection with the place of business from which they were picked up, . . . [was] armed with [a] sharp instrument[], . . . [and] used or threatened a substantial degree of force." *Id.* at 908. "Both crimes occurred at approximately the same time of day[] and involved a similar *modus operandi* in that the passenger indicated that he did not have the money for a fare upon arrival at his destination . . . before proceeding with the robbery." *Id.* Despite the factual similarities between the crimes, we concluded that those similarities were not enough to satisfy the government's

burden of proving criminal signature.   In reaching that conclusion, we recognized that several of the factors upon which the trial court relied were sufficiently commonplace and added little weight to the analysis.   Specifically, we noted that "robberies of middle-aged cab drivers during evening hours . . . are not especially unusual occurrences, nor is the use of a sharp instrument in the commission of such robberies."   *Id.* at 909.   Further, we took notice of the differences between the two situations.   In one case, the assailant "threatened the driver, took a small amount of money, and immediately left the scene," whereas in the other case, the assailant had an accomplice and when they were dissatisfied with the meager proceeds of the robbery, they violently ransacked the cab, "kidnapped the driver, held him at knifepoint, and continually threatened his life while commandeering the taxi for a half hour."[7]   *Id.*

Here, there were some factual similarities between the crimes.   All of the

---

[7]   Interestingly, appellant presented a similar issue of severance in a separate case where he was charged with various aggravated assaults against competing taxi drivers. *See Tornero v. United States*, 94 A.3d 1 (D.C. 2014) (*Tornero I*).   We upheld the denial of his motion and affirmed his conviction, concluding that "the similarities between the attacks go beyond the sufficiently commonplace."   *Id*. at 11-13.   The court in *Tornero I* considered the similarities between the victims, the location of the attacks, the time of day of the attacks, and the method of attack used in each instance.   It reasons, *a fortiori*, that the absence of those similarities here, which narrowly counseled for affirmance in *Tornero I*, argues against a similar conclusion in this case.

victims were picked up in taxi cabs, all three sexual assaults took place in the back seat of those cabs, and in all three incidents the rear door handles would not open the rear doors of the cabs. In the R.G. and N.R. cases, both women testified that the taxi driver/assailant was wearing fingerless black gloves and both described their assailants as being a light to medium complexion black male with some thin facial hair. However, that is the extent of the similarities. With respect to identification, N.R. described her assailant as having a fairly prominent scar on his face, while R.G. failed to mention any such scar on the face of her assailant. Although the trial court believed there were similarities between the composite sketches of the perpetrator in the R.G. and N.R. crimes, this finding was insufficient to establish by clear and convincing evidence the identity of appellant as the assailant in both attacks.[8] Moreover, the types of accent described by R.G. and N.R. were different with one being described as Ethiopian and the other Jamaican.[9]

---

[8] While a similar appearance of attackers is part of the inquiry, *see Bowyer v. United States*, 422 A.2d 973, 976-77 (D.C. 1980), in this case, despite what the court believed were similarities between the sketches, the descriptions of the various assailants are not sufficiently similar to show that the same person is likely to have committed the crimes. We note that one sketch illustrates appellant's distinctive scar against his nose, while two others do not. This differentiates *Bowyer*, where all victims described their assailant as having a distinct "pockmarked" face with a "poor complexion." *Id.* at 977.

[9] Appellant contends on appeal that he does not have a foreign accent at all

(continued . . .)

The dissimilarities between these cases are not limited to the identity of the assailant. While there was testimony in the R.G. and N.R. cases that the assailant put on a condom before demanding sexual favors and that he demanded oral sex before he forced them to have sexual intercourse, there was no testimony about how the sexual assaults were accomplished in a way that made it unique or signature. The assailant in R.G.'s case used his hands to choke her into sexual submission, while the assailant in the N.R. case used a gun and a knife to scare N.R. into complying with his wishes, and C.A. was sexually assaulted while she was incapacitated. The use of weapons to effectuate the sexual assaults was also dissimilar; N.R.'s assailant used a dagger and a gun, while R.G. and C.A.'s assailant did not use any weapons. The women were picked up at different times during the day and in different locations. One of the victims was accompanied by her child during the alleged attacked and the others were alone. Further, significant periods of time separated these assaults. *Cf. Coleman*, 619 A.2d at 44 (finding similarity between crimes occurring two days apart). While there are some similarities between the sexual assaults involving R.G. and N.R., this alone is not enough to establish that these sexual assaults were signature crimes from which

---

(. . . continued)
and that he was born and raised in the District.

it could be reasonably inferred that appellant was the perpetrator in both attacks.

There is also no evidence of any common plan or scheme utilized by appellant to identify his victims in advance or to somehow gain their trust and confidence to lure them into a dangerous situation, which might identify him as the attacker in the R.G. case.   While each of the victims was a Latina woman, R.G. had her young child with her when she apparently hailed a cab, was kidnapped, and ultimately sexually assaulted.   That clearly distinguishes her case from that of N.R. who hailed a cab driven by the appellant but was alone and of C.A. where there is no evidence how she found herself in appellant's taxi.   Further, the events spanned over three years, and each woman was picked up and dropped off in a different part of the metropolitan area.   There also does not appear to be any similarities in the way in which the assailant acted towards each of the women when they entered his cab or in the manner in which he forced them to succumb to his sexual demands.   Thus, there are significant differences between where and how the crimes were committed that might lead us to believe there existed a common plan or scheme.

In C.A.'s case, we have no meaningful way to determine whether there are any similarities between her case and the others beyond the fact that there was

evidence presented she was sexually assaulted in the back seat of a taxi while incapacitated. This absence inhibits our ability to engage in the type of analysis necessary to conclude that there was reasonable probability that the assailant in C.A. was the same person who assaulted R.G. What we do know from the C.A. case is that appellant used newspaper to line the back seat of the taxi before assaulting her, something not done in the other two cases. Thus the record is lacking for us to conclude that there was reasonable probability that the assailant in R.G. was the same person who assaulted C.A. that evening or vice versa.

Therefore, we hold that the circumstances surrounding the R.G., N.R., and C.A. cases were not so distinctive or unusual that there was a reasonable probability that the same person was involved in all three assaults. Thus, the trial court erred as a matter of law when it allowed evidence from the N.R. and C.A. cases to prove appellant's identity in the R.G. case. Likewise without any identification in the R.G. case,[10] the court erred when it allowed evidence of the R.G. case into the N.R. and C.A. cases because the government had failed to establish by clear and convincing evidence that appellant committed the sexual assault of R.G. As such, the court erred in denying appellant's motion for

---

[10] The absence of identification in R.G. is discussed in the next section.

severance.

### III. The Sexual Assault of R.G.

Having concluded that the trial court erred in allowing evidence from the N.R. and C.A. cases to prove identity in R.G., we must determine whether the government proved by sufficient evidence that appellant committed the assault in the R.G.  "We review challenges to the sufficiency of the evidence by viewing the 'evidence in the light most favorable to the government, giving full play to the right of the [fact finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact.'"  *Coghill v. United States*, 982 A.2d 802, 806 (D.C. 2009) (citation omitted).  "We can only determine that the evidence is insufficient if we conclude, as a matter of law, that no reasonable juror . . . , could convict on the evidence presented."  *Beatty v. United States*, 544 A.2d 699, 701 (D.C. 1988) (citation omitted).  In this case, there was no evidence that a reasonable jury could rely upon to find that it was the appellant who committed the kidnapping and sexual assault of R.G. beyond a reasonable doubt.

R.G. never identified appellant as her assailant and no physical evidence linked appellant to the assault.   Nevertheless, the government argues that because

the composite sketch prepared based on R.G.'s description of the perpetrator was reasonably similar to the composite sketch prepared in response to N.R.'s description of her assailant, the evidence that appellant was the perpetrator in the R.G. affair was sufficient.

In *In re R.H.M.*, 630 A.2d 705, 706-09 (D.C. 1993), we were faced with a similar circumstance where the evidence identifying the defendant as the person who committed the crime was insufficient to support a conviction. There, the only eyewitness to a fire-bombing was unable and declined to make an in-court identification of the defendant as having been involved in the arson. *Id*. at 707 n.5. The eyewitness could only testify that four months after the event when shown an array of nine photographs he selected three photographs that "looked familiar to him from seeing them on the night of the fire-bombing." *Id.* We held that the photographic array was insufficient to constitute an out-of-court identification, and where there was no in-court identification or evidence linking the appellant to the alleged arson, the conviction could not stand.[11] *Id*. at 708.

---

[11] We note that the trial court, in denying appellant's motion for severance, found that appellant had committed the assault of R.G. based on the court's finding that a composite sketch made from R.G. description of her assailant was similar to a sketch made from N.R. description of her assailant, which was also similar to appellant's appearance, despite the absence of an in-court or out-of-court identification by R.G. The various sketches and a photograph of appellant were

(continued . . .)

In this case, R.G. never made any identification of appellant, in or out of court and any likeness that one might glean between the composite sketches prepared in response to R.G.'s description of her assailant and N.R.'s description of appellant is akin to R.G. looking at the N.R. composite sketch and testifying that the person in the sketch looks familiar.

Also, like the facts in *R.H.M.*, there is no physical evidence linking appellant to the crimes against R.G., and for the reasons explained above, the evidence of his alleged sexual assault of N.R. and C.A. are not probative of his identity as the assailant in the R.G. matter. Thus, the evidence was insufficient for the government to establish by clear and convincing evidence or for any reasonable juror to find beyond a reasonable doubt that it was the appellant who kidnapped and sexually assaulted R.G. For that reason, we are compelled to reverse appellant's convictions for kidnapping and sexually assaulting R.G.

---

(. . . continued)
included in the record, and we are unconvinced that a compelling similarity exists that would either support the court's finding or excuse the absence of a witness identification. Thus, we do not credit the court's finding in our analysis.

## IV. The Sexual Assault of N.R.

Appellant also argues that the denial of his motion to sever these cases severely prejudiced him in his defense to the allegations of sexual assault in the N.R. case and, therefore, that conviction also must be reversed on appeal. Despite the error in failing to sever these offenses, we are satisfied that the error was harmless in the N.R. case because the government's case against appellant in the N.R. matter was overwhelming. "Under a harmless error standard, reversal is not warranted if we determine, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Jones v. United States*, 17 A.3d 628, 634 (D.C. 2011) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)); *see also Morris v. United States*, 548 A.2d 1383, 1386 (D.C. 1988) (With misjoinder, "[t]o avoid reversal . . . the government must show that the misjoinder has had no substantial and injurious effect or influence in determining the jury's verdict."); *United States v. Nicely*, 922 F.2d 850, 855 (D.C. Cir. 1991) (noting that the error from the denial of a motion to sever is "prejudicial if one cannot reasonably conclude that the judgment was not substantially swayed by the error").

Here, appellant claimed fabrication as his defense to the sexual assault of

N.R. charges, namely that the victim fabricated both the sexual intercourse and the weapons. Appellant, however, offered no evidence from which the jury could reasonably conclude that N.R. had any reason or motivation to fabricate the sexual assault. Conversely, N.R.'s testimony that she attempted to exit appellant's taxi unsuccessfully, that he took her to a location not of her choosing, and that appellant sexually assaulted her in the back of his cab was credited by the jury and her testimony was supported by DNA evidence recovered from her breasts, as well as evidence of a vaginal tear that was discovered during the SANE exam. N.R.'s supervisor also testified that she was crying when she arrived at work and she said that a taxi driver had raped her, offering further support to the accusation. Therefore, even though the trial court improperly failed to sever the offenses in this case, we are firmly convinced that the error as to N.R. was harmless, and we affirm appellant's convictions for kidnapping and sexually assaulting N.R. Additionally, we are unpersuaded by appellant's argument that his fabrication defense was somehow prejudiced by the improper joinder where appellant failed to present even a minimally compelling argument that might suggest N.R.'s motivation to fabricate a serious allegation of sexual assault.

## V. The Sexual Assault of C.A.

With regard to C.A., appellant argues that the trial court lacked jurisdiction over the kidnapping and sexual assault charges.[12] As explained, we agree with appellant's argument and reverse his convictions in the C.A. case.

"Subject matter jurisdiction in a criminal case must always be proven beyond a reasonable doubt." *Long v. United States*, 940 A.2d 87, 99 (D.C. 2007) (citation omitted). This court reviews a trial court's assertion of jurisdiction *de novo*. *Dyson v. United States*, 848 A.2d 603, 609 (D.C. 2004). "It is presumed that an offense charged was committed within the jurisdiction of the court in which the charge is filed unless the evidence affirmatively shows otherwise." *Adair v. United States*, 391 A.2d 288, 290 (D.C. 1978) (citation omitted). This means that appellant, "as the party asserting lack of jurisdiction, . . . bears the burden of presenting the facts that would establish that lack." *Id.* (citing *State v. Lucero*, 482 P.2d 70, 71 (N.M. Ct. App. 1971)).

---

[12] Upon consideration of a Motion for New Trial filed by appellant during the pendency of this appeal, the trial court found that it did not have jurisdiction over the C.A. matter. We nonetheless resolve the issue here, rather than remand the case back to the trial court.

"[A] crime may be the result of a series of acts . . . [and] [t]he direct consequences may be made to occur at various times and in different localities." *Id.* "[T]he Superior Court has jurisdiction of any criminal case under any law applicable exclusively to the District of Columbia." *United States v. Baish*, 460 A.2d 38, 40 (D.C. 1983) (citing D.C. Code § 11-923 (b)(1) (2012 Repl.)). The criminal act alone need not constitute the offense. *Id.* "Where it serves as one of several constituent elements to the complete offense, we have found jurisdiction to prosecute in the Superior Court, even though the remaining elements occurred outside of the District." *Id*. at 40 (citations omitted).

To obtain a conviction for second-degree sexual abuse, the government was required to prove that: (1) appellant engaged in a sexual act with C.A. and (2) appellant knew, or had reason to know, that C.A. was incapable of appraising the nature of the sexual conduct, incapable of declining participation in the sexual act, or incapable of communicating unwillingness to engage in the sexual act. D.C. Code § 22-3003 (2012 Repl.). To prove kidnapping, the government is required to establish that appellant seized, confined, inveigled, enticed, decoyed, kidnapped, abducted, concealed, or carried away C.A. with the intent to hold or detain her. D.C. Code § 22-2001 (2012 Repl.). "Seizure and detention of the victim against her will is 'the heart of the crime.'" *Smothers v. United States*, 403 A.2d 306, 313

(D.C. 1979) (quoting *United States v. Wolford*, 444 F.2d 876, 883 (D.C. Cir. 1971)).

Here, the evidence presented by the government was not compelling and required a jury to speculate that appellant moved C.A. from the District to Maryland. The cell phone records do not definitively indicate that they were both in the District at the same time. While appellant's storage locker is located in Hyattsville, Maryland and C.A.'s cell phone pinged in Hyattsville, again, it is not clear that appellant is the individual who drove C.A. into Maryland. For that reason, the government failed to established that appellant transported C.A. anywhere "against her will" as required in *Smothers*.

In *Smothers*, a case with even stronger evidence against the defendant than what was presented here, we held that the evidence was insufficient to find the appellant kidnapped the victim. *Id.* The evidence in *Smothers* established that the victim had just finished shopping at Iverson Mall when she called her sister and told her that she would be at her house in ten minutes. *Id.* at 308. The appellant was also at Iverson Mall at the same time, and previously told a friend that he intended to rob women with a pistol while at the mall. *Id.* The victim's body was later found miles away from the mall, riddled with bullets and positioned in a

way that was clear that she had been raped at that spot moments before being shot. *Id.* at 312. However, we found the evidence insufficient to support a kidnapping conviction. *Id.* at 313. We acknowledged that there was "absolutely no evidence that even remotely suggest[ed] that the decedent willingly went to [the location where she was found] with the appellant," but given the lack of evidence about what transpired, the court found that "neither direct nor circumstantial evidence showed a taking against will." *Id.* Likewise, in this case, there is no evidence to show that appellant took C.A. against her will. Indeed there is no evidence establishing that appellant transported C.A. to Maryland, or anywhere else for that matter. The only evidence is that C.A. found herself in Virginia in appellant's vehicle the next morning.

The government argues that because C.A. was intoxicated, she could not have consented to being taken to Maryland. However, this argument presupposes the unsupported fact that C.A. entered appellant's vehicle in the District. There is no evidence concerning how or when C.A. entered appellant's taxi and the government's arguments about what happened are highly speculative. Thus, the evidence is insufficient to find that appellant kidnapped her, as no reasonable juror could find appellant took C.A. against her will.

Because the evidence was insufficient to support a finding that the trial court possessed jurisdiction over these charges, we reverse appellant's kidnapping and sexual assault conviction in the C.A. case.[13]

## V. Conclusion

For the foregoing reasons, we affirm appellant's conviction as to N.R. because the trial court's failure to sever the trials was harmless error, reverse appellant's conviction as to R.G. due to insufficient evidence, and reverse and vacate appellant's conviction as to C.A. for lack of jurisdiction.

*So ordered.*

---

[13] The government further argues that the *mens rea* element of the sexual assault occurred in the District, that is, appellant formed the intent to sexually assault C.A. when he picked her up in the District because cell tower evidence showed that C.A. entered appellant's taxi cab at 2:00 a.m. and that within seventeen minutes she was in Hyattsville. However, "[i]n the criminal law, both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur." *Conley v. United States*, 79 A.3d 270, 278 n.29 (D.C. 2013) (citations omitted). The government conflates the idea of premeditation, an element of some crimes such as first-degree murder, with the requirement of second-degree sexual assault, which simply requires knowing or having reason to know that the other person is incapable of consent at the time of the sexual encounter. Second-degree sexual assault does not require premeditation before the crime, but rather a certain *mens rea* at the time of the crime. Furthermore, as explained, there is no evidence from which it can be concluded that appellant kidnapped C.A. within the District with the intention of sexually assaulting her in Maryland. Thus, we are unpersuaded by the government's argument.