*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0004

MAURICE BELLAMY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF1-004628)

(Hon. Lynn Leibovitz, Motion Judge)
(Hon. Juliet J. McKenna, Trial Judge)

(Submitted October 1, 2020            Decided June 29, 2023)

*Steven R. Kiersh* was on the brief for appellant.

*Timothy J. Shea*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman*, *Elizabeth H. Danello* and *Bryan H. Han*, Assistant United States Attorneys, were on the brief for appellee.

Before EASTERLY, *Associate Judge*, and RUIZ and GLICKMAN,[*] *Senior Judges*.

RUIZ, *Senior Judge*: A jury found appellant Maurice Bellamy guilty of one

count of first degree felony murder of Arthur Baldwin, Jr., one count of first degree

_____

[*] Judge Glickman was an Associate Judge of the court at the time of submission. He began his service as a Senior Judge on December 21, 2022.

premeditated murder of Devonte Washington, and related weapons charges. On appeal, appellant argues that the trial court erred by: (1) denying his motion to sever the charges for the two murders and try them separately; (2) not dismissing an enhancement of the charge for the murder of Washington as especially heinous, atrocious or cruel, which he claims is unconstitutional; and (3) denying appellant's request to instruct the jury on imperfect self-defense. For the following reasons, we affirm.

## I. Factual and Procedural History

The charges against appellant involved two killings, occurring three months apart. On December 15, 2015, Arthur Baldwin, Jr., was fatally shot in the course of an armed robbery, while he was waiting in his car for his girlfriend. On March 26, 2016, 15-year-old Devonte Washington was fatally shot, for no apparent reason, while waiting on a metro platform with his mother and younger sisters.

A grand jury charged appellant with six counts related to the two shootings. For the shooting of Baldwin, appellant was charged with one count of robbery;[1] one count of first degree felony murder while armed with aggravating circumstances (for murder committed while committing or attempting to commit a robbery);[2] and two counts of possession of a firearm during a crime of violence or dangerous offense (PFCV).[3] For the shooting of Washington, appellant was charged with one count of first degree premeditated murder while armed with aggravating circumstances (for an especially heinous, atrocious or cruel murder)[4] and one count of PFCV.[5]

Appellant filed a pretrial motion to sever the counts related to the killing of Baldwin from the counts related to the killing of Washington. The government opposed. After a hearing, Judge Leibovitz denied the motion to sever, concluding

_____

[1] D.C. Code §§ 22-2801, 22-4502.

[2] D.C. Code §§ 22-2101, 22-4502, 22-2104.01(b)(8).

[3] D.C. Code § 22- 4504(b).

[4] D.C. Code §§ 22-2101, 22-4502, 22-2104.01(b)(4).

[5] D.C. Code § 22- 4504(b).

that the evidence of each shooting was admissible in the trial of the other and appellant would not suffer undue prejudice if they were tried jointly.

Judge McKenna presided over the trial. For the shooting of Arthur Baldwin, the government presented evidence that appellant committed the robbery and murder along with Dennis Morton and Charles Sims. At the time, appellant was living with Dennis Morton and his wife, Ronika Minnick. Charles Sims is Ronika Minnick's cousin.

Morton testified that he and Sims received a tip from a local drug dealer, Alfonso Murray, that a man sitting in his car was waiting to buy drugs from a competing drug dealer. Murray asked them to help him rob the man, and appellant joined the group. The man in the car was Arthur Baldwin, Jr. It was a case of mistaken identity. Baldwin, an off-duty Secret Service officer, was not there to buy drugs but instead was waiting for his girlfriend. He was unarmed.

As the foursome approached, Murray blocked Baldwin's car by parking behind him; appellant held Baldwin at gunpoint on the driver's side with a silver

.38 caliber revolver; Sims searched the backseat while wielding his .22 caliber handgun; and Morton searched the trunk, realizing then that Murray had just sent them to rob a random person. When Baldwin attempted to exit his car, appellant shot him twice from the driver's side, followed by Sims shooting multiple times from the rear passenger side.

Evidence from an autopsy found he was shot with two .38 caliber bullets and three .22 caliber bullets. Forensic evidence revealed that skin cells on the driver's side door of Baldwin's car matched appellant's DNA profile. Two items were stolen from Baldwin, an iPad and his wallet. Minnick testified that appellant gave her the iPad which she then tried to sell.

For the shooting of 15-year-old Devonte Washington, the government presented evidence that appellant randomly shot Washington in front of his family members while they were waiting for the metro at the Deanwood station. Metro security cameras recorded the entire incident from beginning to end, and several eyewitnesses testified to the actions captured by the surveillance video. The video showed that Washington entered the station with his mother and two younger sisters at around the same time as Morton, Minnick, their son, and appellant

arrived at the metro station. Washington and appellant were strangers who had never seen each other before.

Washington and his family headed up the escalator to the metro platform first, followed shortly by appellant and his group. The Washington family walked down the platform and sat on a bench surrounded by a plexiglass kiosk, waiting for the train. Appellant and his group also went down the platform, passing Washington and his family on the bench.

Appellant then came up to Washington, who was on his cell phone. Appellant asked Washington "what the F was he looking at," prompting Washington to respond "What?" in confusion. Washington stood up, and appellant almost instantly shot him twice in the chest, while his mother and younger sisters sat on the bench close by. Washington's mother tried to run after appellant as he fled down the escalator, but, unable to catch him, she returned to her screaming daughters and called 911. Morton testified that Washington was unarmed and did not make any threats against appellant.

Forensic evidence showed that Washington was shot with two .38 caliber bullets, which went through his body and were recovered in the metro station. Without objection, the government's firearms and tools examiner opined that the .38 caliber bullets that were recovered from Baldwin's body were fired from the same gun that was used to shoot Washington. Morton, who was present at both shootings, testified that appellant used the same silver .38 caliber gun to shoot Baldwin and Washington.

Toward the end of the government's case-in-chief, appellant renewed his motion to sever the charges related to the two killings. Defense counsel argued the motion should be granted because the government's testimony was "extremely prejudicial." Judge McKenna denied the renewed motion to sever because, among other reasons, like Judge Leibovitz, she found no undue prejudice.

The jury found appellant guilty of four of the six charges. For the shooting of Washington, the jury found appellant guilty of first-degree premeditated murder while armed — including aggravating circumstances for an especially heinous, atrocious or cruel murder — and PFCV. For the shooting of Baldwin, the jury found appellant guilty of the charges of robbery and first-degree felony murder

while armed — including aggravating circumstances for murder committed while committing a robbery — but not the two PFCV charges.

Appellant was sentenced to a total of sixty-five years of incarceration. For the murder of Baldwin, appellant was sentenced to thirty years for the murder and five years for the robbery, running concurrently. For the convictions related to the shooting of Washington, appellant was sentenced to thirty-five years for the murder and five years for the firearm charge, also running concurrently. The sentences for each of the two shootings run consecutively. Appellant filed a direct appeal with this court.

## II. Motion to Sever

Joinder of offenses is permissible when two or more offenses "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." *See* Super. Ct. Crim. R. 8(a). However, if joinder "appears to prejudice a defendant . . . the [trial] court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." *See* Super. Ct. Crim. R. 14(a). Appellant contends that the trial court erred by denying the

motion to sever the charges and try each shooting separately. Specifically, he argues that evidence of the two murders was not mutually admissible and trying the two murders together unduly prejudiced him with the jury.

We review denial of a motion for severance based on prejudicial joinder for abuse of discretion. *See Tornero v. United States*, 161 A.3d 675, 681 (D.C. 2017). An abuse of discretion can be shown based on "the most compelling prejudice, from which the court would be unable to afford protection if the offenses were tried together." *Id.* at 682 (quoting *Bailey v. United States*, 10 A.3d 637, 642 (D.C. 2010)). Compelling prejudice, however, "does not encompass all prejudice." *Bailey*, 10 A.3d at 642 (citing *Arnold v. United States*, 358 A.2d 335, 338 (D.C. 1976) (en banc)). Rather, an "appellant must demonstrate more than a simple showing that appellant would have stood a better chance of acquittal had the charges been tried separately." *Id.*

Although there is "a presumption favoring joinder," a trial judge faced with a motion for severance "must balance the possibility of prejudice to the defendant[] against the legitimate probative force of the evidence and the interest in judicial economy." *Dyson v. United States*, 848 A.2d 603, 612 (D.C. 2004) (quoting *Bittle*

*v. United States*, 410 A.2d 1383, 1386 (D.C. 1980)). Severance may be warranted "where the evidence would not be mutually admissible at separate trials, or the evidence of the multiple charges is likely to be amalgamated in the jury's mind into a single inculpatory mass." *Bailey*, 10 A.3d at 643. Multiple charges are likely to be amalgamated if "the jury was unable to keep the evidence of each distinct and separate in deliberating and reaching a verdict." *Atchison v. United States*, 982 A.2d 1138, 1144 (D.C. 2009).

Whether evidence of different offenses is mutually admissible can be established based on a "*Drew* exception" for other-crimes evidence, or based on a determination that evidence of the two offenses constitute "*Johnson* evidence." *See Sweet v. United States*, 756 A.2d 366, 376 (D.C. 2000) ("Mutual admissibility of evidence in separate trials is determined generally by applying a *Drew* analysis. However, the *Drew* analysis is not required [under *Johnson*] where the evidence is 'not independent of the crime charged and the evidence is direct proof of the crime charged.'" (internal citation and ellipsis omitted) (quoting *Johnson v. United States*, 683 A.2d 1087, 1101 (D.C. 1996) (en banc))).

In *Drew*, the D.C. Circuit explained that, although evidence of "other crimes" is not admissible to prove general criminal propensity, other-crimes evidence can be admitted for another "substantial, legitimate purpose." *Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964). Such a purpose includes, but is not limited to, proof of: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, and (5) identity. *See id.* at 90 & n.10. Accordingly, severance is generally unwarranted when, applying a *Drew* analysis, evidence of two or more independent crimes would be mutually admissible in separate trials. *Id.* at 90. The D.C. Circuit reasoned that "the prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possibility in separate trials." *Id.*[6]

_____

[6] Where there is a *Drew* exception to other-crimes evidence based on its relevance to a permissible purpose, the court uses four factors to determine admissibility:

> (1) there must be clear and convincing evidence that the defendant committed the other offense; (2) the evidence of the other offense must be directed to a genuine, material and contested issue in the case; (3) the evidence must be logically relevant to prove the issue for a reason other than its power to demonstrate criminal propensity; and (4) the evidence must be more probative than prejudicial.

*Roper v. United States*, 564 A.2d 726, 731 (D.C. 1989) (per curiam) (internal citations omitted). These factors are reviewed based on the "totality of the factual

In *Johnson*, the court clarified circumstances in which a *Drew* exception does not apply but where evidence still would be mutually admissible. 683 A.2d at 1096. The court explained that *Drew* "was directed at crimes *independent* of the crime charged," not evidence "admissible as *direct proof* of guilt." *Id.* (emphases added). Thus, the court in *Johnson* underscored that "[s]pecifically, *Drew* does not apply where such evidence: (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." 683 A.2d at 1098. Both *Drew* and *Johnson* evidence must "be excluded if its probative value is substantially outweighed by . . . unfair prejudice." *Id.* at 1099 (quoting Federal Rule of Evidence 403).

Appellant argues that the motion to sever should have been granted because evidence of neither shooting was admissible at a trial of the other shooting. We disagree. The evidence was mutually admissible under *Drew* for a "substantial, legitimate purpose," not to prove general criminal propensity. *Drew*, 331 F.2d at 89-90. Unchallenged toolmark comparison evidence was introduced to establish

---

circumstances." *Thomas v. United States*, 59 A.3d 1252, 1260 (D.C. 2013) (quoting *Easton v. United States*, 533 A.2d 904, 907 (D.C. 1987)).

that the two murder victims were shot with .38 caliber bullets fired from the same gun. But see *infra* note 7. As Judge Leibovitz explained at the pre-trial hearing on the initial motion to sever, the "firearm . . . used as to one offense is evidence of identity as to the second offense and vice versa." Judge Leibovitz acknowledged that "guns can change hands," but in this case the proffered evidence suggested otherwise: Morton would testify he was present at both shootings and that appellant wielded the same silver firearm each time. Hence, Judge Leibovitz ruled that the toolmark examiner's testimony about the gun that fired the bullets and Morton's testimony as to appellant's use of the same firearm for both shootings "would come in at both trials and would be mutually admissible as to each offense." At trial, when defense counsel renewed the motion to sever, Judge McKenna reasoned that testimony of Morton and Minnick, who testified about both shootings, was mutually admissible to place their testimony in context. The judge explained that

> it is crucial for the jury to have a full picture not only of Mr. Morton and Ms. Minnick's relationship with [appellant], but to explain why it is that Mr. Morton and Ms. Minnick did not come forward immediately after the shooting death of Arthur Baldwin and why Mr. Morton and Ms. Minnick, even when they ultimately did come forward, provided false testimony or false information to the investigating authorities.

Judge McKenna likewise recognized that the testimony of Metropolitan Police Department detectives about their investigation was mutually admissible for the

purpose of explaining to the jury why Morton and Minnick delayed identifying appellant as a perpetrator in the Baldwin shooting until after they saw appellant shoot Washington, which in turn delayed discovering a match for appellant's DNA on the driver-side handle of Baldwin's vehicle. Appellant's claim that evidence of the two murders does not fall under *Drew* or *Johnson* is not sustainable.

Appellant argues that even if the evidence was mutually admissible, it should have been excluded because its probative value was substantially outweighed by its prejudicial impact. Both judges were aware that when considering a motion to sever, a trial court must always consider prejudice. *See* Super. Ct. Crim. R. 14(a); *Johnson*, 683 A.2d at 1101; *Dyson v. United States*, 848 A.2d 603, 612 (D.C. 2004). In concluding that appellant would not suffer undue prejudice if the two murders were tried together, both Judge Leibovitz and Judge McKenna relied on the government's ability to keep the evidence "separate and distinct." Before trial, Judge Leibovitz explained that because the two incidents occurred months apart, under dissimilar circumstances, and involved different victims, they were not likely to be amalgamated in the jury's mind. The government generally presented its evidence in two main tranches: first as to the shooting of Devonte Washington, and then as to the shooting of Arthur Baldwin.

Shortly before the government finished presenting its case-in-chief, Judge McKenna noted that the government had been able to keep the evidence of the two incidents "separate and distinct" by labeling exhibits with the initials of the decedents. She also explained that jury instructions would separate the offenses for each decedent with headers, and jurors would receive separate verdict forms, one for each shooting, with only the counts relevant to the respective shooting.

We recognize there is a difference between the government's presentation of evidence in a separate and distinct manner and the *jury*'s ability to keep the evidence separate in its deliberation of the two offenses. As we explained in *Atchison*, a defendant can prove prejudice by showing that "the jury was unable to keep the evidence of each distinct and separate in deliberating and reaching a verdict." 982 A.2d at 1144. Here, appellant attempts to meet his burden by highlighting what he contends was the "highly emotional" nature of the evidence concerning these two murders. On renewing the motion to sever, defense counsel argued that the testimony of the government's witnesses was "extremely prejudicial" because the crimes against the victims — an off-duty Secret Service officer sitting in his car and a 15-year-old juvenile waiting for the metro — were "vicious," and the family members of each of the victims all "broke down" on the

witness stand.  According to counsel, "no human being could not be affected and have an incredible amount of sympathy for these people."

We can agree that the evidence showed vicious, gratuitous crimes against totally innocent victims.  That does not mean, however, that, even if repulsed by the acts described by the witnesses, the jurors would not be able to objectively evaluate the evidence they were asked to consider in responding to separate verdict forms for each shooting.  We see no evidence in the record that they failed to do so and rushed to judgment based on an emotional reaction.  The jury deliberated for approximately one and a half days.  They sent two notes asking questions during their deliberations.  In returning a felony murder verdict for the Baldwin killing, the jury did not find appellant guilty of the PFCV charges, showing that the jury was not sufficiently convinced by testimony that appellant shot Baldwin, and that it exercised judgment in applying the jury instructions to the evidence it credited.

Appellant argues that the prejudicial impact of evidence of the Baldwin murder substantially outweighed its relatively minor probative value to prove the charges of the Washington shooting in light of the video and eyewitness evidence that identified appellant as the perpetrator and showed the entire sequence of

events at the metro platform where Washington was killed. But for the same reason, any possible prejudicial effect resulting from a joint trial with the charges related to the Baldwin shooting paled in comparison to the overwhelming evidence that appellant shot Devonte Washington. *See Tornero*, 161 A.3d at 686-67 (citing *Jones v. United States*, 17 A.3d 628, 634 (D.C. 2011). Video evidence from metro security cameras, which the jury viewed, showed all actions appellant took from entering the metro station, to standing on the platform, to shooting Washington twice, to fleeing the station. It also showed the unprovoked nature of the shooting, including a lack of interaction between appellant and Washington until appellant decided to approach the young man.

Evidence that appellant shot Washington was not incidental to proving that appellant also shot Baldwin. There was no video recording of the Baldwin shooting and the eyewitnesses to the crime were questioned and cross-examined about their bias: appellant's alleged co-perpetrators, one of whom (Morton) had an incentive to curry favor with the government to avoid being charged himself and one of whom (Sims) was already convicted and sentenced for the same murder. However, Morton's testimony that appellant shot Baldwin was corroborated by the toolmark examiner's opinion tying the gun that fired the .38 caliber bullets found in Baldwin's body to the gun that fired the .38 caliber bullets that went through

Washington's body and were recovered from the Metro station.[7] Morton, who was present at both shootings testified that he saw appellant use the same silver gun both times. Evidence that Morton saw appellant shoot Washington was probative, as it helped to explain what prompted Morton to belatedly identify appellant as one of the persons who shot Baldwin in the course of the robbery and, eventually, to implicate himself in that crime. We have no reason to question the trial court's determination that the probative value of this evidence was not substantially outweighed by its prejudicial effect. To be sure, the family members' testimony was emotional at times, but it also was a fair and straightforward factual account of what occurred, and the government did not stray into impermissibly emotional questioning. Thus, the family members' testimony was not "unfairly inflammatory" and did not cause appellant to be unfairly prejudiced. *Johnson*, 683

_____

[7] The unqualified testimony of the government's toolmark examiner that the .38 caliber bullets at both murders were fired from the same gun should not have been admitted. *See Gardner v. United States*, 140 A.3d 1172, 1184 (D.C. 2016). Even though the error in admitting the unqualified testimony was clear, *see Williams v. United States*, 210 A.3d 734, 744 (D.C. 2019), no objection was made at the trial court on this basis and the issue is not raised on appeal. We, therefore, assess the trial court's determination, which we review for abuse of discretion, on the basis of the record before the trial court. *Cf. Jones v. United States*, 202 A.3d 1154, 1159 n.10 (D.C. 2019) ("As this hearsay testimony was received without objection, it could be 'properly considered by the trier of fact and given its full probative value.'" (quoting *Eldridge v. United States*, 492 A.2d 879, 883 (D.C. 1985))). As mentioned in the text, the toolmark examiner's opinion was one of several pieces of evidence the trial court weighed in deciding to deny the motion for severance.

A.2d at 1102. In addition to the safeguards adopted at trial to keep the two crimes separate in the minds of the jurors, appellant was able to present his defenses to the charges for each shooting in a joint trial as they were different and not contradictory. Appellant attacked the credibility of the government's witnesses and forensic evidence that identified him as a participant in the Baldwin shooting. With respect to the shooting of Washington, on the other hand, faced with a video recording that chronicled appellant shooting Washington at the metro station, at closing he conceded to killing the young boy but argued he did so without premeditation, in a bid to mitigate the charge to voluntary manslaughter. On this record, we cannot say the trial court abused its discretion in denying the motion to sever the charges for the two shootings into separate trials.

## III. Enhancement for Especially Heinous, Atrocious or Cruel Circumstances

For the count of premeditated first degree murder while armed for the shooting of Washington, the grand jury included a charge for aggravating circumstances, i.e., "that the murder was especially heinous, atrocious or cruel." D.C. Code § 22-2104.01(b)(4) provides that where such aggravating circumstances

exist, "a sentence of more than 60 years up to, and including, life imprisonment without release may be imposed."

In accordance with this charge, the trial court gave the following jury instruction: "If you find that Maurice Bellamy committed the offense of first-degree premeditated murder while armed, you should go on to determine, beyond a reasonable doubt, whether the murder was especially heinous, atrocious or cruel." During deliberations, the jury sent "a note asking if there is clarification or further guidance as to the definition of heinous, atrocious and cruel." The trial court noted that the "statute does not further define those terms." Defense counsel proposed that the jury be instructed to "read the statute again" without providing any definition, and the government did not oppose. The trial court drafted the following response, to which both parties agreed: "The statute does not further define especially heinous, atrocious or cruel."

Because appellant did not seek dismissal of the enhancement or object to the jury instruction at trial, we review for plain error.[8] *Collins v. United States*, 73

---

[8] Appellant made a glancing reference to a "problem" with the statute, referring to it as "impermissibly vague." This comment was made after the case

A.3d 974, 980 (D.C. 2013) (permitting reversal for plain error where appellant failed to raise an issue at trial only when appellant can prove: "(1) there is error, (2) the error is plain, meaning 'clear' or 'obvious,' . . . (3) the error affected [appellant's] substantial rights[,] [and (4)] the error seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." (alterations and omission in original) (quoting *Baker v. United States*, 867 A.2d 988, 1002 (D.C. 2005))). Appellant argues that the enhancement cannot stand because the statutory language is unconstitutionally vague. We do not reach this constitutional argument, however, because appellant's sentence for Washington's murder was well within the time prescribed for incarceration for first-degree murder and fell far short of the enhanced sentence permitted by D.C. Code § 22-2104.01(b)(4).

The punishment for first degree murder "shall be not less than 30 years nor more than life imprisonment without release." D.C. Code § 22-2104(a). For first

_____

was submitted to the jury, during the discussion of the jury note asking for further guidance. As mentioned in the text, appellant agreed to the judge's proposed response to the jury and at no point argued that the enhancement charge should be dismissed because it could not be constitutionally applied in this case. In fact, at one point in the course of the government's further questioning of Dr. Titus, who conducted the autopsy of Washington, defense counsel objected by stating "it has now been established sufficiently, I would submit, to satisfy the elements of the . . . aggravating circumstances of the statute. Now I believe any more of these questions would be cumulative and prejudicial, in fact, would outweigh the proba[tive] value because the statute has been satisfied."

degree murder while armed, the maximum sentence is "life imprisonment or life imprisonment without possibility of release."  D.C. Code § 22-4502(a)(3).  In determining whether to "impose a sentence of more than 60 years up to, and including, life imprisonment without possibility of release" for first degree murder, a trial court must consider whether aggravating circumstances, proved beyond a reasonable doubt, were "especially heinous, atrocious or cruel."  D.C. Code §§ 22-2104.01(a), (b)(4).

The jury found that such aggravating circumstances existed in the murder of Washington. [9]  Although the judge could have enhanced the sentence, she did not do so.  Appellant was sentenced to thirty-five years of imprisonment for the murder of Washington, well within the sentencing guidelines for first degree premeditated murder while armed without any aggravating circumstances.  The sentence is also far less than the more than sixty years possible under an enhancement for a murder found to be especially heinous, atrocious or cruel.  Thus, even assuming the statutory terms are impermissibly vague and that the enhancement would be unconstitutional if applied in this case — questions we do

---

[9]  In its arguments to the jury, the government stressed the location of the shooting and that it was perpetrated in front of the victim's mother and young sisters.

not decide — appellant cannot show that his substantial rights were violated because he did not receive an enhanced sentence. *Ewing v. United States*, 36 A.3d 839, 851 n.45 (D.C. 2012) (concluding that any error in requiring a jury to determine that a murder was "especially heinous, atrocious, or cruel" would only be harmless error because the court did not impose an enhanced sentence). As a result, appellant has not shown plain error.

## IV. Imperfect Self-Defense

Finally, appellant argues that the trial court erred by denying his request to instruct the jury on imperfect self-defense. Before jury deliberations, defense counsel requested that the trial court include an instruction on imperfect self-defense with respect to the shooting of Washington. In denying the request, the trial court reasoned that "the evidence just simply would not allow a reasonable jury to find that [appellant] had a subjective actual belief that his life was in danger or that he had a like belief that he had to react with the force that he did even though such beliefs were objectively unreasonable." We agree with the trial court's decision not to instruct on imperfect self-defense as to the murder of Washington.

In *Swann v. United States*, 648 A.2d 928 (D.C. 1994), we distinguished self-defense from imperfect self-defense. Under the doctrine of self-defense, acquittal of a homicide is possible if a defendant can show: (1) "an actual belief both that he or she [was] in imminent danger of serious bodily harm or death and in the need to use deadly force in order to save himself or herself" and (2) "the defendant's [actual] belief [was] objectively reasonable." *Id.* at 930. Under the doctrine of imperfect self-defense, in contrast, the belief does not have to be objectively reasonable but must be "actually and honestly held." *Id.* In other words, appellant's belief need only be subjective, even if unreasonable. *Id.* at 932. Self-defense is a complete defense to a murder charge; it negates the element of malice and renders the killing not a crime at all. *Id.* at 930 (citing *Comber v. United States*, 584 A.2d 26, 41 (D.C. 1990) (en banc). Imperfect self-defense does not lead to acquittal but instead reduces a murder charge to voluntary manslaughter. *Id.* at 932-33.

If a defendant asserts imperfect self-defense, a jury instruction is merited "only if there is evidence in the record to support the request." *Corbin v. United States*, 120 A.3d 588, 606 (D.C. 2015) (quoting *Fearwell v. United States*, 886 A.2d 95, 101 (D.C. 2005)). When reviewing the denial of a requested defense

instruction, the evidence is viewed in the light most favorable to the defendant. *See Swann*, 648 A.2d at 933.

As the trial court explained, the evidence would not support a jury finding that appellant had a subjective belief that his life was in imminent danger, requiring the use of deadly force, when he shot Washington. Washington simply responded "what" and stood up from his seat on the platform bench after appellant approached and said, "what the F was he looking at?" Washington had no object, let alone a weapon, in his hand, and appellant had no prior relationship with Washington of any kind that could have led appellant to believe that Washington would harm him.

On appeal, appellant argues that there was sufficient evidence to support the jury instruction on imperfect self-defense because "the record is clear that defendant and decedent interacted prior to entering the metro platform and there was some additional hostile interaction on the platform," in part based on statements from Morton and Minnick that appellant told them that Washington was

"mugging" on appellant.[10]   But this argument was refuted by the metro video recording, which showed that appellant and Washington were not near each other — either downstairs at the fare machine or upstairs on the platform — before appellant approached and shot Washington.  At trial, the government noted that the video evidence showed that Washington never even looked at appellant until they were up on the platform.  Even if appellant subjectively believed Washington had been watching or staring or scowling at him that would not present a threat of serious bodily harm or death to justify the use of lethal force in self-defense.  Accordingly, viewing the evidence in the light most favorable to appellant, we conclude that the trial court did not abuse its discretion in denying the request for a jury instruction on imperfect self-defense.

*  *  *  *  *

For the foregoing reasons, the trial court's judgment is affirmed.

*So ordered.*

_____

[10]  Minnick testified that appellant told her, while they were at the fare card machine, that Washington "keeps mugging me, like watching me, he keep mugging me."